Richard A. **SULLIVAN**, Plaintiff–Appellant,

v.

**RIVER VALLEY SCHOOL DISTRICT, and Charles O. Williams, Superintendent, individually and in his official capacity, Defendants–Appellees.**

No. 98–2143.

United States Court of Appeals, Sixth Circuit.

Argued: Sept. 21, 1999

Decided and Filed: Nov. 29, 1999

---

Robert A. Yingst (argued and briefed), Boothby & Yingst, Berrien Springs, Michigan, for Appellant.

C. George Johnson (argued and briefed), Timothy R. Winship (briefed), Thrun, Maatsch & Nordberg, Lansing, Michigan, for Appellees.

Before: BOGGS and DAUGHTREY, Circuit Judges; and MCKINLEY,* District Judge.

## OPINION

BOGGS, Circuit Judge.

■ Richard Sullivan appeals the district court's grant of summary judgment to Defendants on his claims of discrimination and retaliation, in violation of the Americans with Disabilities Act and the Michigan Handicappers Civil Rights Act. Sullivan argues that his employer, the River Valley School District, and its then-Superintendent, Charles Williams,[1] regarded him as disabled and illegally suspended

him without pay for refusing to submit to mental and physical fitness-for-duty examinations ordered by the school board. The district court held that Sullivan failed to provide evidence sufficient for a jury to infer that he received adverse treatment due to being regarded as disabled. Because we agree that an employer's ordering an employee to undergo mental and physical examinations does not suffice to show that an employer regards an employee as disabled, we affirm the district court's grant of summary judgment to Defendants.

## I

Sullivan has been a teacher in the River Valley School District since 1977. He has tenure. Prior to 1995, he had not been reprimanded or disciplined and had received consistently satisfactory job evaluations. Even considering the facts in the light most favorable to Sullivan, his behavior apparently changed for the stranger beginning in 1995. At a January 23 meeting of the school board that considered grievances he had filed, Sullivan allegedly engaged in disruptive and abusive verbal outbursts, shoved papers in the faces of individual members of the board, and refused to stop when asked by the board president. Around February 6, Sullivan disclosed confidential information about one of his student's grades and a related grade change hearing to a local newspaper. In a February 7 letter to the student government president, Sullivan criticized a decision of the group's faculty sponsor in language deemed inappropriate by the district. Sullivan then failed to report for a March 6 meeting with Superintendent Williams to discuss these incidents.

---

* The Honorable Joseph H. McKinley, Jr., United States District Judge for the Western District of Kentucky, sitting by designation.

1. Individual supervisors who do not independently qualify under the statutory definition of employers may not be held personally liable in ADA cases. Thus, as the district court held, the claims against Superintendent Williams in his individual capacity should be dismissed. *See Wathen v. General Electric,* 115 F.3d 400, 404–05 n. 6 (6th Cir.1997) (holding that an individual supervisor may not be held personally liable under Title VII and noting that the Title VII and ADA liability schemes are similar in this regard).

In a March 15 letter, Superintendent Williams contacted psychologist Timothy Onkka for an informal review of Sullivan's behavior. The Defendants say that because of the odd behavior exhibited by Sullivan, Dr. Williams wanted input from an objective observer as to Sullivan's fitness as a teacher and whether Sullivan needed professional attention. Williams sent Dr. Onkka selected materials including letters and grievances from Sullivan and letters from others about Sullivan for Onkka's examination. According to Dr. Onkka, Williams told him he thought Sullivan might be dangerous and mentally unstable. Dr. Onkka reported back to Williams on April 14 that he did not think Sullivan dangerous, but did think the materials he reviewed suggested Sullivan had a possible psychiatric disorder for which a more formal psychological assessment should be considered. Williams allegedly presented the letter to the school board without explaining the limited nature of Dr. Onkka's review. Williams suspended Sullivan with pay on April 27, 1995 pending board action on Williams's recommendation that Sullivan be required to undergo mental and physical fitness-for-duty exams.

On March 24, 1995, Williams made derogatory remarks about Sullivan to Principal Degner. Degner then included negative comments in Sullivan's job evaluation without observing Sullivan in the classroom. Sullivan argues that the negative evaluation was retaliation intended to further the perception of him as disabled due to mental instability. Degner concedes that the comments were inappropriate according to the terms of the employment contract and the policies of the district, because Sullivan was neither confronted with them nor given an opportunity to respond to them and because the comments were not withheld from the evaluation until an investigation was completed and disciplinary action taken.

■ Sullivan supposedly then threatened school board members at an April 24 meeting. After an unfavorable hearing regarding his payment of union representation fees, he stated to board president Dennis Zeiger, "You'll be sorry for this," and told another board member, "You will regret this." Sullivan failed to comply with the superintendent's April 27 (verbal), and May 4 and May 24 (written) directives to turn over his grade book and lesson plan book to one of his principals. Sullivan also refused to comply with the board's May 8 decision to accept Williams's recommendation that Sullivan be required to undergo mental and physical fitness-for-duty examinations, and he continued to ignore May 23 and May 31 written directives from Williams that he schedule appointments for the exams and inform the superintendent's office of the dates and times. Sullivan claims that the stated reasons for ordering his psychological exam and his suspension were pretextual and that the exams were ordered as deliberate acts of retaliation by the school district.[2]

Sullivan also purportedly failed to comply with the superintendent's directive that he make arrangements to review tenure charges to be filed against him. On June 19, 1995, Williams sent a letter by certified mail demanding a meeting with Sullivan over the list of incidents mentioned above.

2. Citing this pretext as a reason not to trust the school district's doctors, Sullivan gave the school board copies of results from examinations by his own doctors conducted on May 4 and 6 attesting to his fitness for continued employment. But Sullivan may not dictate the terms of his medical examination. The Fourth Circuit has upheld a discharge against an ADA challenge where an employee had his private doctor's release to work but refused to take a functional capacity evaluation required by the employer with another doctor. *See Porter v. United States Alumoweld Co.*, 125 F.3d 243, 245–46 (4th Cir.1997). Likewise, in a pre-ADA case brought under § 1983, the Second Circuit upheld the suspension of a teacher who refused to submit to a return-to-duty physical exam by the school district's male doctor, offering instead to be examined by a female doctor chosen by the superintendent at her own expense. *See Gargiul v. Tompkins*, 790 F.2d 265, 266 (2d Cir.1986).

Sullivan did not receive this letter until June 30; which was Superintendent Williams's last day on the job, and no meeting ever took place. The incidents were the basis for the tenure charges that the district brought against Sullivan that month. The River Valley School Board determined on July 24, 1995 that the various purported acts of misconduct and insubordination by Sullivan were grounds for discharging him. Sullivan appealed that decision to the Michigan State Tenure Commission, which decided on May 23, 1996 that while his actions did not merit discharge they did merit a three-year unpaid suspension. That suspension has now been completed. The commission also directed Sullivan to undergo mental and physical examinations at the school board's expense. Sullivan's suspension was upheld by the State Court of Appeals, and his outstanding motions for leave to appeal to the Michigan Supreme Court were denied on March 30, 1999 and June 29, 1999.

## II

■ Under the ADA, in the absence of direct evidence of disability discrimination, a plaintiff may seek to establish a prima facie case of discrimination. Once established, a prima facie case shifts the burden to the employer to offer a legitimate, nondiscriminatory reason for its action. If the employer articulates such a reason, the plaintiff must then show that the reason given by the employer is pretextual in order to prevail. 42 U.S.C. §§ 12101 *et seq.; See also Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1178, 1184–86 (6th Cir.1996), and *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ To establish his prima facie case of discrimination under the ADA, Sullivan must show that he is (1) a disabled person within the meaning of the Act, (2) that he is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) that he suffered an adverse employment decision due to his disability. *See McKay v. Toyota Motor Mfg., U.S.A., Inc.,* 110 F.3d 369, 371 (6th Cir.1997). The Act defines a disabled person as one who (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (2) has a record of such impairment, or (3) does not have. an impairment, but is regarded as having one. *See* 42 U.S.C. § 12102(2). The Act defines three ways that someone may be "regarded as" disabled, but since Sullivan stipulates that he has no actual disability of any kind, he could only qualify under the third: having no impairment but being treated by a covered entity as having a substantially limiting impairment. *See* 29 C.F.R. § 1630.2(1) (1996). Thus, to make out his prima facie case, Sullivan must show that the River Valley School District treated him as having an impairment that substantially limits one or more of his major life activities, that he is otherwise qualified to teach, and that he was suspended from teaching because the school district regarded him as disabled.

■ Sullivan's evidence that his employer treated him as impaired is that his employer asked him to undergo mental and physical examinations to determine his fitness as a teacher following his allegedly exhibiting some unusual behavior. Given that an employer needs to be able to determine the cause of an employee's aberrant behavior, this is not enough to suggest that the employee is regarded as mentally disabled. As the district court ably explained, a defendant employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled. (Dist. Ct. Op. at 11, *citing Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir.1996) (holding that an offer of a paid medical leave of absence does not show that an employee was regarded as disabled)). *See also Kvintus v. R.L. Polk & Co.,* 3 F.Supp.2d 788, 796 (E.D.Mich.1998) (refusing to infer perception of disability from an employer's

offer to plaintiff of a paid medical disability leave and noting that "[t]o hold otherwise would unnecessarily inhibit employers from any inquiry regarding the status of behavior on the part of an employee that an employer may perceive as inappropriate for the employment environment").

As noted by the district court, the Eighth Circuit has held specifically that an employer's awareness of behavior that one might associate with an impairment does not of itself show treatment of an employee as disabled and that requiring an employee to see a psychologist before returning to work does not run afoul of the ADA:

> An employer's request for a mental evaluation is not inappropriate if it is not obvious that an employee suffers from a disability. A request for an evaluation is not equivalent to treatment of the employee as though she were substantially impaired. Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims under §§ 12112(a) and 12102(2)(C).

*Cody v. CIGNA Healthcare of St. Louis, Inc.,* 139 F.3d 595, 599 (8th Cir.1998) (citations omitted).

■ A request that an employee obtain a medical exam may signal that an employee's job performance is suffering, but that cannot itself prove perception of a disability because it does not prove that the employer perceives the employee to have an impairment that substantially limits one or more of the employee's major life activities. Deteriorating performance may be linked to motivation or other reasons unrelated to disability, and even poor performance may not constitute a disability under the ADA. Under the Act, working qualifies as a "major life activity." 29 C.F.R. § 1630.2(i). However, the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. *See Gilday v. Mecosta County,* 124 F.3d 760, 767 (6th Cir.1997) (collecting cases). A *fortiori,* a mere deterioration in performance at a single, particular job cannot constitute a disability. Just as requesting a mental evaluation does not indicate that an employer regards an employee as disabled, so too expressing concern over an employee's job performance does not show that an employer regards an employee as having a disability that substantially limits a major life activity. Sullivan simply has not provided evidence sufficient to show that his employer regarded him as disabled.

■ Sullivan argues that if an employer can order mental and physical examinations in a case such as his, there is no limit to when an employer can require such tests. In particular, Sullivan worries that a decision adverse to him on the "shaky facts" of his case would "suggest[ ] that the psychological labeling from an 'outside psychologist' . . . can lead to an employer's arbitrary investigation of anyone's psychological history" (Appellant's Brief at 29). Were that true, it would indeed be a cause for concern. However, an employer's discretion to order employees to undergo examinations is hardly unbounded. Post-hiring demands for examinations can only be made where shown to be "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). Thus, for an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job. An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can "perform job-related functions." 42 U.S.C. § 12112(d)(4)(B).

■ Hence, according to the interpretation in Equal Employment Opportunity Commission regulations, any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential

functions of the job. *See* 29 C.F.R. Part 1630, App. § 1630.14(c) (offering interpretive guidance to § 1630.14(c)). While not controlling authority, this administrative interpretation does represent "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Accordingly, we adopt this qualification for a fitness-for-duty examination, acknowledging it is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance. While it is true that the ADA limits an employer's ability to request unfounded examinations to prevent "the unwanted exposure of the employee's disability and the stigma it may carry," an employer may order a well-founded examination. *EEOC v. Prevo's Family Market, Inc.,* 135 F.3d 1089, 1094 n. 8 (6th Cir.1998). As the district court held, health problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination "even if the examination might disclose whether the employee is disabled or the extent of any disability." (Dist. Ct. Op. at 15, *quoting Yin v. State of California,* 95 F.3d 864, 868 (9th Cir. 1996)). The same is true for ordering a mental examination when aberrant behavior similarly affects an employee's job performance.[3]

■ The examinations ordered for Sullivan by defendants in this case meet this standard. Sullivan's behavior had given the school district reason to seek further information about his fitness for continued employment. Though we need not decide today whether advice from an outside health professional is always necessary, we note that the district's obtaining advice that further examination was needed to determine Sullivan's fitness to work buttresses the district's claim that it had reason to believe Sullivan could not perform some essential aspects of his job. This court has upheld requiring mental and physical exams as a precondition to returning to work. *See Pesterfield v. TVA,* 941 F.2d 437–38 (6th Cir.1991). We have also upheld a finding of insubordination for refusing to submit to such exams. *See Moore v. Board of Educ. of Johnson City Schs.,* 134 F.3d 781, 783 (6th Cir.1998). Though we also need not decide today whether the district could require Sullivan to pay for the examinations, we note that the Fourth Circuit has upheld a dismissal where the employee refused to pay for a fitness-for-return-to-duty exam after obtaining a general release to work from his own physician similar to Sullivan's. *See Porter,* 125 F.3d at 245–46. Since Sullivan never submitted to the examinations, he precluded himself from being able to establish a genuine issue of material fact as to whether the exams were related to his job, or were too broad in scope.

■ Sullivan asks this court to adopt a standard that medical examinations could only be ordered if an employee has requested accommodation or if an employer has objective evidence that the employee poses a direct threat to himself or others. There is no good reason to confine an employer's ability to determine the fitness of employees only to instances where they pose a direct threat. Even in that context, this court has already rejected the objective evidence requirement when it was urged by the dissent in *EEOC v. Prevo's Family Market. See Prevo's,* 135 F.3d at 1101–02 (Moore, J., dissenting). The Defendants ask the court to apply the stan-

---

3. Sullivan implicitly argues for a more stringent standard for mental examinations. Indeed, although also ordered to undergo a physical examination, Sullivan does not complain of being perceived to have a physical disability. But Plaintiff provides no statutory or case law authority for such a distinction.

We note that the Eighth Circuit has upheld, in a Rehabilitation Act context, requiring an employee recovering from depression to submit to a psychological exam before returning to work. *See Brumley v. Pena,* 62 F.3d 277, 278–79 (8th Cir.1995).

dard for proving pretext set out in *Smith v. Chrysler*, and to uphold an employer's request for a medical examination whenever the employer has an honest belief rooted in particularized facts that an employee may not be able to perform the essential functions of his job. *See Smith v. Chrysler Corp.*, 155 F.3d 799, 805–07 (6th Cir.1998). The honest belief standard is appropriate in considering pretext where an employer's intention matters, but there is no need to assess an employer's intent in ordering a fitness-for-duty examination. An employee's protection from harmful intent on an employer's part comes from the dual requirements that there be evidence sufficient for a reasonable person to doubt whether an employee is capable of performing the job, and that any examination be limited to determining an employee's ability to perform essential job functions. The first of these requirements may resemble the *Smith* rule, insofar as honest belief requires the employer "to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith*, 155 F.3d at 807.

 Even were Sullivan to provide evidence that he was regarded as disabled, he would also have to establish that he is otherwise qualified for the job he held. As the district court noted, Sullivan does not dispute the evidence that he threatened members of the school board as alleged. Since "threatening other employees disqualifies one" from a job, Sullivan would not be able to meet this requirement. *Palmer v. Circuit Court of Cook County*, 117 F.3d 351, 352 (7th Cir.1997), *cert. denied*, 522 U.S. 1096, 118 S.Ct. 893, 139 L.Ed.2d 879 (1998).

 The final element of a prima facie case that Sullivan had to prove is that he was suspended from teaching because he was regarded as disabled, in other words that his suspension was due to discrimination. Here again Sullivan relies on his employer's request that he undergo mental and physical examinations for proof. But an examination ordered for valid reasons can neither count as an adverse job action nor prove discrimination. And while the district's subsequent suspending of Sullivan is an adverse job action, it was based on his refusal to undergo the valid examinations, which is not a discriminatory reason.

### III

 Had Sullivan established a prima facie case, the burden would have shifted to the Defendants to articulate a legitimate, nondiscriminatory reason for the adverse employment action taken. Though Sullivan never forced this burden upon them, it is worth noting that Defendants did offer such a reason. In particular, Defendants argue that they sought Sullivan's discharge because of repeated episodes of insubordination, not limited to his refusal to undergo mental and physical examinations. Sullivan has not established a genuine issue of material fact as to the reasons for his suspension and attempted discharge. The state tenure commission's upholding of Sullivan's suspension strongly suggests that the school district's actions were not wholly baseless, even though the commission did reduce Sullivan's discharge to a three-year suspension without pay.

 Once the school district had offered a legitimate, nondiscriminatory reason for its actions, the burden would have shifted back to Sullivan to show that the reason was pretextual and that discrimination against his disability was the real motivation for the district's actions. Sullivan's efforts to show that the explanations for the school district's actions are pretextual misconceive what counts as pretext. Sullivan argues that the school district mounted a campaign during the 1994–95 school year to get rid of him. To show pretext, he points to evidence such as Principal Degner's including negative remarks in Sullivan's job evaluations without actually observing him in the classroom. But it is not enough to show that the Defendants

had motives to get rid of him other than these they profess. Sullivan must show that the school district's purported reasons for acting were a pretext for underlying *discriminatory* reasons. Showing pretext is not the same as showing pretext for discrimination.

■ Evidence of this misconception regarding pretext crops up in several places in Sullivan's argument to the court. For instance, Plaintiff states that the Defendants' ordering of the exam was merely "a ruse to further discriminatory stereotyping so as to justify an adverse job action" (Appellant's Brief at 19) and that "Defendants' reasons for ordering Mr. Sullivan to seek a psychological evaluation were ... to create and foster the perception of Mr. Sullivan as being mentally unstable" (Appellant's Brief at 27). These statements suggest that the Plaintiff believes that the Defendants never really thought he was disabled, but fostered that impression to harass him, tarnish his reputation and make it easier to oust him. If this is true, though it may be unprofessional and petty, it would not violate the ADA or the MHCRA.

■ The ADA simply does not protect an employee from an employer's knowingly false accusation of having a disability. Rather, it protects employees from employers who mistakenly treat them as if they have a disability. An employee's lack of a disability does not shield an employer from liability for *discriminatory* conduct based on a mistaken but genuine belief that an employee is disabled, but the ADA does not proscribe deliberately fostering a false impression of disability. It only protects an employee who actually has or is actually believed to have a disability. As another court has put it recently: "The ADA prohibits discrimination, not action taken using discrimination as a pretext." *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 195 n. 10 (3d Cir.1999).

## IV

■ Finally, we come to Sullivan's retaliation claim. The ADA's prohibition on retaliation prevents an employer from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]." 42 U.S.C. § 12203(a). To make out a case of retaliation, Sullivan must show: "(1) that he engaged in protected activity; (2) that he suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir.1997).

■ From Sullivan's argument, it is not at all clear what the supposed protected activity was. If it was refusing to submit to the mental and physical exams, then the retaliation argument is logically incoherent. Plaintiff would be arguing that Defendants ordered him to undergo mental and physical examinations in retaliation for his refusing to undergo mental and physical examinations. But obviously the Defendants could not have been retaliating for Sullivan's not doing something that they had not yet asked him to do. If the supposed protected activity was something else, Sullivan has not shown how any of his other behavior was a protected means of opposing an act or practice made illegal by the ADA. As the state ALJ found in Sullivan's separate action challenging his discharge: "[I]t was incumbent upon appellant to challenge [the board's] actions through legal recourse, as appellant had done in the past, and not to engage in misconduct and insubordination to enforce his rights." Besides which, as discussed above, Defendants were entitled to order the examinations. For this reason, ordering Sullivan to undergo the examinations was not itself an adverse employment action, and suspending him for refusing to comply was not retaliatory.

## V

Plaintiff Sullivan failed to make out a prima facie case of being regarded as disabled and did not rebut Defendants' legitimate, nondiscriminatory reason for pursuing his discharge. Sullivan created no genuine issue of material fact as to the reasons for the actions his employer took against him. Rather than show that the Defendants' stated reasons for seeking his discharge were a pretext for discrimination, Sullivan tried to show that Defendants simply had ulterior reasons for their actions against him. Without a showing that those other reasons were discriminatory, however, Sullivan cannot establish a prima facie case for relief under the ADA or MHCRA. Sullivan likewise failed to make out a prima facie case with regard to his retaliation claims. Hence, the judgment of the district court granting summary judgment to Defendants is AFFIRMED.