Alexander A. **MEDLIN,** Plaintiff,

v.

**ROME STRIP STEEL CO., INC.; Kirk Hinman; Roger Pratt; Walter Race; Corporate Health Dimensions, Inc.; Joann Catanzarita; Impact; and Cindy M. Bush,** Defendants.

No. 5:01–CV–1520.

United States District Court, N.D. New York.

Dec. 10, 2003.

Alexander Medlin, Rome, NY, Pro se plaintiff.

Bond, Schoeneck & King, Attorneys for defendants Rome Strip Steel Co., Inc.; Kirk B. Hinman; Roger Pratt; and Walter Race, Syracuse, NY, Larry P. Malfitano, Esq., of counsel.

Martin, Ganitos Law Firm, Attorneys for defendants Corporate Health Dimensions, Inc. and Joann Catanzarits, DeWitt, NY, Michael C. Austin, Esq., of counsel.

Sugarman, Wallace Law Firm, Attorneys for defendants Impact and Cindy Bush, Syracuse, NY, Matthew D. Gumaer, Esq., of counsel.

## MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

*Pro se* plaintiff Alexander Medlin ("plaintiff") brings this suit against defendants Rome Strip Steel Co., Inc. ("RSS"), Kirk Hinman ("Hinman"), Roger Pratt ("Pratt"), Walter Race ("Race"),[1] Corporate Health Dimensions, Inc., and Joann Catanzarita ("Catanzarita"),[2] Impact and Cindy Bush,[3] alleging disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the New York State Human Rights Law, N.Y. Exec. Law §§ 290–301, and improper disclosure of confidential medical information in violation of the ADA, 42 U.S.C. § 12112(d).[4]

On June 30, 2003, RSS, Hinman, Pratt, and Race ("defendants") filed a motion for summary judgment on plaintiff's ADA claims pursuant to Fed.R.Civ.P. 56.[5]

(Docket Nos. 33–37.) Plaintiff opposed. (Docket Nos. 40–44.) The motion was taken on submit; no oral argument was heard. (Docket No. 45.)

## II. FACTUAL BACKGROUND

Plaintiff began his employment with RSS in March of 1994. (Docket No. 35, ¶ 1; Docket No. 42, ¶ 1.) In 1999, plaintiff held the position of Hot Roll Slitter Operator. (Docket No. 35, ¶ 4; Docket No. 42, ¶ 4.) This position involved using hand tools that weighed up to thirty pounds, occasional handing of slitting knives, rubbers, and spacers that weighed up to thirty-two pounds, bending at the waist to pick up scrap weighing anywhere between twenty to fifty pounds, cutting strips with electric shears weighing up to forty pounds, pushing, pulling, turning, kneeling, standing or walking on concrete floors, and walking up and down stairs. (Docket No. 43, Ex. K; Docket No. 37, Ex. 1.). Plain-

---

1. At all relevant times in this case, Hinman was President of RSS, Pratt was the manager of the RSS plant where plaintiff worked, and Race was his supervisor at the plant.

2. Catanzarita, who was the nurse at the RSS plant where plaintiff worked, was an employee of Corporate Health Dimensions, Inc., a company contracted to provide on-site medical services to RSS employees. A stay of this action has been granted as against these two defendants because their insurance carrier is currently in receivership for the purposes of rehabilitation. (Docket No. 39.) Plaintiff has intimated that he would be inclined to dismiss these two defendants from the case if they provided certain discovery he requested, (Docket No. 43, Ex. X), though there is no indication that either has been dismissed. No opinion is expressed as to whether either Catanzarita or Corporate Health Dimensions, Inc., is a proper defendant in this case, and the case will proceed to trial as against the other defendants, regardless of whether the stay remains in effect.

3. Plaintiff voluntarily dismissed his claims as against Impact, the company contracted to administer to plaintiff a functional capacity

exam and it's employee, Cindy Bush. (Docket No. 43, Ex. X.)

4. Plaintiff has voluntarily dismissed claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634(b). (Docket No. 35, ¶¶ 25–26; Docket No. 42, ¶¶ 25–26; Docket No. 40, pp. 8–9.)

5. Defendants requested leave to respond to plaintiff's opposition papers, which they claim raised for the first time a disability discrimination claim under the New York State Human Rights Law. (Docket No. 46.) As plaintiff pointed out, however, such claim was indeed raised at both the administrative level and in the complaint. *See* Docket No. 1, p. 3, § 5(F) ("The conduct complained of in this action involves ... Human rights violated"); Docket No. 43, Ex. V (stating that discrimination charge was filed with "NYS Division of Human Rights and EEOC"); Docket No. 43, Ex. W (same).

tiff, however, claims that this job description "is outdated, as modifications have been made to the [slitter] since 1997 to ease the physical requirements of the job[,] with extensive changes made since January 2000." (Docket No. 44, ¶ 4.)

On October 3, 1999, plaintiff was involved in a non-work-related accident. (Docket No. 35, ¶ 5; Docket No. 42, ¶ 5.) The day of the accident, Dr. Andrew Zaleski "treated plaintiff for back injuries consisting of a suspected coccyx fracture and compression fracture of his spine." (Docket No. 35, ¶ 6; Docket No. 42, ¶ 6.) He advised plaintiff to avoid "any bending, lifting or climbing stairs." (Docket No. 43, Ex. G.)

Starting on October 5, 1999, and continuing throughout the year, Catanzarita, the Corporate Dimensions Health, Inc. nurse contractually obligated to provide on-site medical assistance to RSS employees, began recommending that plaintiff start a physical therapy program for his injuries. (Docket No. 35, ¶ 12; Docket No. 42, ¶ 12.) Plaintiff claims, however, that Dr. Zaleski informed him that such therapy was neither necessary nor proper for his specific injury. (Docket No. 44, ¶ 12.) By letter dated October 7, 1999, the company notified plaintiff that he was approved to take the maximum twelve weeks of leave, beginning retroactively on the date of the accident. (Docket No. 43, Ex. F; Docket No. 35, ¶ 7; Docket No. 42, ¶ 7.)

Just over two weeks after the accident, on October 19, 1999, Dr. Zaleski noted that plaintiff "still [had] soreness . . . with occasional swelling," and that he was "unable to bend and lift." (Docket No. 43, Ex. D.) Dr. Zaleski noted that plaintiff would be inquiring about the possibility of returning to work on light duty. *Id.* By November 12, 1999, Dr. Zaleski noted that plaintiff's condition was improving. (Docket No. 43, Ex. G.) Though plaintiff was allegedly

"able to squat down without any great discomfort[,] . . . he still complain[ed] of severe [back] pain." *Id.* Plaintiff claims that it was during this month, October of 1999, that he first suggested that he be assigned light duty and/or to a different, less physically strenuous position.

On November 23, 1999, Dr. Zaleski advised plaintiff to begin performing exercises while seated and while prone. Despite the improvements, the doctor noted that plaintiff at that time was still "unable to engage in his normal work as he is unable to lift, which is required on the job." (Docket No. 43, Ex. G.) Accordingly, he issued to plaintiff a slip stating that he was not to work until January 4, 2000. (Docket No. 43, Ex. U; Docket No. 37, Ex. 2.)

On December 13, 1999, plaintiff wrote a letter to Pratt, the manager at the RSS plant where plaintiff worked, asking for an extension of his leave. (Docket No. 43, Ex. L; Docket No. 37, Ex. 4.) Plaintiff indicated he was going to seek a second opinion. *Id.* By letter dated January 4, 2000, the company notified plaintiff that his leave would not be extended "due to business demands." (Docket No. 43, Ex. L; Docket No. 37, Ex. 5.) Plaintiff was informed that his "employment with [RSS] [would] be terminated unless [he] return[ed] to work on or before January 10, 2000, with a medical release from [his] physician stating [he][was] able to return to work." *Id.*

That same day, January 4, 2000, plaintiff went to see Dr. Zaleski again. The doctor noted that plaintiff had "been doing well," with no complaints of back pain and a progressive stabilization of the fracture. (Docket No. 43, Ex. G.) Dr. Zaleski allegedly reviewed with plaintiff his work duties, which the doctor noted involved lifting weights up to thirty pounds, reaching, and placing slitting knives and rubber spacers on arbors. (Docket No. 43, Ex.

G.) Satisfied with plaintiff's belief that he felt able to perform the duties, Dr. Zaleski issued to plaintiff a slip stating that plaintiff was fit to return to work without restrictions. (Docket No. 43, Ex. G; Docket No. 37, Ex. 6.)

Plaintiff gave the return to work slip to Catanzarita. She noted that plaintiff had "told [Dr. Zaleski] that he has to come back to work [without] restrictions, so [Dr. Zaleski] agreed." (Docket No. 43, Ex. J.) Citing plaintiff's lack of physical therapy or back exercise program, she voiced her concern that he was returning to work too quickly, "as [his] job [was] very physically demanding." *Id.* She relayed these concerns to Pratt, who concurred, and "sen[t] a job description to Dr. Zaleski to assure a clear understanding of what job the employee has to be released to return to, and possible safety concerns." *Id.;* Docket No. 43, Ex. K. The job description sent to Dr. Zaleski included all of the physical activities mentioned above, *supra,* that are required of a hot roll slitter operator. Plaintiff, as noted, disagrees that the description adequately portrays the job since, "a[s] of January 4, 2000[,] the Hot Roll Slitter Machine was equipped with a jib hoist, a rolling floor board (step), hydraulic shears, and [a] plasma cutter." (Docket No. 41, ¶ 26.) The fax also notified Dr. Zaleski that the company did not allow light duty in plaintiff's case. *Id.* At some point on this day, plaintiff claims to have again requested assignment to light duty or a different position. According to company policy, dated April 8, 1998, light duty work would only be granted to employees "injured on the job and out of work on worker's compensation[.]" (Docket No. 43, Ex. R.; Docket No. 37, Ex. 11.)

After speaking with Dr. Zaleski by telephone conference call, it was decided that a "functional capacity evaluation" ("FCE") would be conducted on plaintiff to determine his physical suitability to perform the functions of a hot roll slitter operator. (Docket No. 43, Ex. J.). The FCE was scheduled for the next day, and Impact was contracted to administer it. (Docket No. 43, Ex. J; Docket No. 43, Ex. G.) On January 5, 2000, plaintiff was administered the FCE by Impact representative Cindy Bush. "The goal of the evaluation was to determine if [plaintiff's] residual functional capacities met the known job demands of a Hot Roll, Slitter Operator." (Docket No. 43, Ex. L; Docket No. 37, Ex. 9.) Bush concluded that, while plaintiff demonstrated an "ability to perform lifting tasks within the Heavy category," "he was unable to maintain safe work practices or a heart rate profile required for the level of repetitions and duration for a complete Hot Roll Slitter setup." *Id.* Accordingly, it was recommended that plaintiff's return to work with no restrictions be delayed until after successful participation in physical therapy and another review. *Id.* Prior to the administration of the FCE, plaintiff signed a release, giving his "authorization for any and all information or data generated, [to] be made available in writing, verbally and/or video taped for a job analysis to all professionals that are involved directly in my case, for use in my rehabilitation." (Docket No. 37, Ex. 8.)

Plaintiff claims that he was informed of the results of the FCE, and specific findings therein, by co-employees before he found out from the company. Plaintiff alleges the co-employees were told this information by Race, his supervisor at RSS, at a meeting.

Dr. Zaleski noted that the FCE was conducted without plaintiff having the benefit of wearing a belt that he was required to wear at work when engaging in heavy lifting. (Docket No. 43, Ex. G.) However, in light of the FCE results, on January 7, 2000, Dr. Zaleski issued to plaintiff another slip, this time stating that he was able

to return to work, but only for light duties until February 22, 2000. (Docket No. 43, Ex. M; Docket No. 37, Ex. 10.) In an internal company e-mail regarding "Alex lite duty," Pratt stated that "[i]t's been our policy that we don't offer light duty for anyone on disability, so this slip means less than the other one did." (Docket No. 43, Ex. L.) On this day, plaintiff again asked to be assigned light duty and/or assigned to a different, less physically demanding position.

On January 18, 2000, plaintiff filed a disability discrimination charge with the New York State Division of Human Rights and the EEOC, alleging he "was fired for not being able to return [to work] without restrictions," that his alleged three separate requests for accommodation were denied by RSS, and that his confidential medical information had been disclosed. (Docket No. 43, Ex. B.) On February 25, 2000, RSS responded to plaintiff's charge. In the response, the company expressed its belief that the January 4, 2000, return to work slip was signed by Dr. Zaleski without the benefit of a physical examination and/or "work suitability test," and that the slip was issued instead on the basis of plaintiff's statement that he could return to work without restrictions. (Docket No. 43, Ex. T.) The company believed some testing, namely the FCE, "was important since [plaintiff] had had numerous conversations with [Catanzarita] stating his inability to return to work... As the results of the evaluation show, [plaintiff] was judged unable to perform his regular duties safely without the possibility of re-injuring himself." *Id.* The company then reiterated its light duty policy, stating that it "do[es] not offer light duty or job changes to employees who are out on disability. The employee must be able to return to full duty and to the position he/she left." *Id.*

On June 27, 2001, the EEOC issued its determination regarding plaintiff's charge. It concluded that "more likely than not, . . . [RSS] discriminated against [plaintiff] by denying [him] an opportunity to return to work and reasonable accommodations." (Docket No. 43, Ex. O.) According to the EEOC, while RSS "raised a legitimate concern regarding the safety and well being of [plaintiff] returning to work, [it] failed to provide any evidence to show that any risks of direct threat or threat to the safety of others CANNOT be reduced with reasonable accommodations." *Id.* (capitalization in original). The Commission deemed RSS's reliance on the results of the FCE "misplaced since the FCE did not assess whether [plaintiff] can return to work WITH reasonable accommodations, rather, it assessed [his] ability to return to work (without restrictions) given his current physical abilities." *Id.* (capitalization in original). The EEOC interpreted the RSS position that plaintiff must be able to return to full duty work as equivalent to a statement by the company that plaintiff "must be able to return to work and be able to perform both marginal and essential job functions without reasonable accommodations." *Id.*

The EEOC also determined that it is "more likely than not [that] RSS violated the confidentiality requirements under the ADA by disclosing [plaintiff's] medical information to his co-workers" before even he found out he had failed the FCE. *Id.* On July 11, 2001, the EEOC issued to plaintiff a right to sue letter. (Docket No. 43, Ex. P.)

### III. DISCUSSION

Defendants have moved for summary judgment on plaintiff's ADA claims pursuant to Fed.R.Civ.P. 56, arguing that: (1) plaintiff was not disabled within the meaning of the ADA; (2) even if plaintiff was a qualified individual with a disability, RSS

had no obligation to create a light duty position, or any position for that matter, for plaintiff; and (3) that neither RSS nor any of its employees released medical information about plaintiff that was confidential or disability-related, and, even if such information was released, plaintiff cannot prove he was harmed thereby. All three of these issues will be discussed.

### A. Summary Judgment Standard

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir.1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson*, 180 F.3d at 436; *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587,

106 S.Ct. 1348. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348.

### B. Plaintiff's ADA Claims

The claims subject to defendants' motion arise under the ADA. The statute provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual[.]" 42 U.S.C. § 12112(a); *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir.2001). "The statute defines 'discriminate' to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.' " *Felix v. N.Y. City Transit Auth.*, 324 F.3d 102, 104 (2d Cir.2003) (quoting 42 U.S.C. § 12112(b)(5)(A)).

■■■■ To establish a claim under the ADA based on the failure to provide reasonable accommodations, plaintiff must establish that: "(1) he was an 'individual who had a disability' within the meaning of the statute; (2)[RSS] had notice of his disability; (3) he could perform the essential functions of the job with reasonable accommodation; and (4)[RSS] refused to make such accommodations."[6] *Parker v. Columbia*

---

**6.** A plaintiff must also demonstrate that the defendant sued is an employer subject to the ADA. *See Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 99 (2d Cir.2003). While admitting that RSS falls within the statutory definition of "employer," 42 U.S.C. § 12111(5), defendants argue that the other moving defendants, all of whom are individuals apparently named in their personal capacities, do

not. Plaintiff argues that, because "agents" of an employer are encompassed within the statutory definition, the individual defendants are covered. *Accord Braverman v. Penobscot Shoe Co.*, 859 F.Supp. 596, 602 (D.Me.1994). Though the Second Circuit has yet to directly address the issue, it has held that individual liability is prohibited under Title VII, which

*Pictures Industries,* 204 F.3d 326, 332 (2d Cir.2000). If plaintiff proves these requirements, RSS may still escape liability if it can show that the reasonable accommodation would cause it undue hardship. *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 6 (2d Cir.1999). As noted, defendants argue that plaintiff was not "disabled," and that, even if he was, RSS was under no obligation to assign him a light duty position, or create for him a new position. Both of these arguments will be addressed in turn.

### 1. *Disability within the statute*

▮ "Disability" is defined under the ADA as "(A) physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Relevant here is subsection (C). "[W]hether an individual is 'regarded as' having a disability 'turns on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability.'" *Colwell v. Suffolk County Police Dep't.,* 158 F.3d 635, 646 (2d Cir.1998) (quoting *Francis v. City of Meriden,* 129 F.3d 281, 284 (2d Cir.1997); *see also Giordano,* 274 F.3d at 748 (labeling employer's perception of alleged impairment "the decisive issue"). There is little dispute that RSS perceived plaintiff to have a "physical impairment," which is defined, *inter alia,* as "[a]ny physiological ... condition ... affecting [the] ... musculoskeletal [system]." *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program,* 198 F.3d 68, 72 (2d Cir.1999) (quoting 29 C.F.R. § 1630.2(h)(1)). Catanzarita expressed her concern, quite adamantly it appears, that plaintiff's back condition rendered it unsafe for him to engage in the heavy weight lifting and rigorous physical demands she claimed was required for the job. Upper management at RSS apparently agreed with her, concurring in her recommendation that plaintiff be administered an FCE.

That RSS perceived plaintiff to have a physical impairment, and ordered the FCE, however, is not enough for him to be considered disabled under subsection (C). According to the Supreme Court, "[t]here are two apparent ways in which individuals may fall within [the] statutory definition [in subsection (C)]: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substan-

---

uses a similar employer definition. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995). Other appellate courts, and various district courts both inside and outside the Second Circuit, have extended a similar holding to the ADA. *See Mason v. Stallings,* 82 F.3d 1007, 1009 (11th Cir.1996) ("As to individual liability, there is no sound reason to read the Disabilities Act any differently from this Court's reading of Title VII and the Age Discrimination Act") (citing with approval *U.S. EEOC v. AIC Sec. Investigations, Ltd.,* 55 F.3d 1276, 1279–82 (7th Cir.1995)); *see also Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 808 n. 1 (6th Cir.1999); *Silk v. City of Chicago,* 194 F.3d 788, 797 n. 5 (7th Cir.1999); *Butler v. City of Prairie Vill.,* 172

F.3d 736, 744 (10th Cir.1999); *Gentile v. Town of Huntington,* 288 F.Supp.2d 316, 321–322 (E.D.N.Y.2003); *Murphy v. Bd. of Educ.,* 273 F.Supp.2d 292, 326 (W.D.N.Y. 2003); *Maull v. Div. of State Police, Dep't of Public Safety, State of Del.,* 141 F.Supp.2d 463, 472 (D.Del.2001); *Meara v. Bennett,* 27 F.Supp.2d 288, 290 (D.Mass.1998) (stating that "it appears virtually settled at this point that no individual liability exists under the ADA"). The position taken by the weight of authority is adopted, and the ADA claims, whether asserted against them in their personal or official capacities, will be dismissed as against defendants Hinman, Pratt, and Race.

tially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

As this language makes clear, it is insufficient for an employer to regard an employee as merely disabled or suffering from an impairment. *Colwell*, 158 F.3d at 646; *Hewitt v. Alcan Aluminum Corp.*, 185 F.Supp.2d 183, 187 (N.D.N.Y.2001) ("the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action"). Instead, it must regard the plaintiff as disabled within the meaning of the ADA. *Colwell*, 158 F.3d at 646; *see also Giordano*, 274 F.3d at 747; *Francis*, 129 F.3d at 284. Thus, the definition of disability under subsection (A), requiring proof that an impairment substantially limits a major life activity, has relevance under subsection (C) as well. *Ryan v. Grae & Rybicki*, 135 F.3d 867, 872 (2d Cir.1998); *DeMar v. Car–Freshner Corp.*, 49 F.Supp.2d 84, 94 (N.D.N.Y.1999) ("the focus is whether Defendant knew of Plaintiff's condition, and, if so, whether it believed that it substantially affected his ability in a major life activity").

▮ Whether plaintiff was considered "disabled" within the meaning of the ADA, therefore, will turn on whether RSS perceived that his back condition substantially limited a major life activity. To aid in the inquiry, it is helpful to first identify which major life activity is alleged as being implicated. In his administrative charge, plaintiff claimed that the major life activities impacted by his back condition were: "pain w/ lifting waist to shoulder level, out of breath and high heart rate when performing life tasks." (Docket No. 43, Ex. B, Part I, Question 1(b).) In the complaint, plaintiff claims he has "chronic back pain with increased heart rate and shortness of breath with activities of daily living." (Docket No. 1, ¶ 4.) In short, from plaintiff's perspective, his ability to lift and breathe are hampered when engaged in unidentified life activities.[7] It is clear, however, to which major life activity plaintiff is referring—working.[8] That this *pro se* plaintiff did not ace legal drafting is no reason to dismiss his case, especially given that the allegations in the administrative charge and complaint do in fact adequately infer the major life activity alleged to be impacted, and defendants' confirmation of the same in their memorandum, which in part focuses on whether plaintiff's condition substantially limited his ability to work.

In any event, plaintiff's subjective characterizations of the activities impacted by his back condition would appear to be irrelevant under the subsection (C) inquiry, which focuses on the activities the employ-

---

7. To the extent that plaintiff is claiming that the major life activity of breathing was substantially limited, or perceived to be so by RSS, such claim is rejected. *See Muller v. Costello*, 187 F.3d 298, 314 (2d Cir.1999) (requiring evidence of difficulty breathing outside of the work environment).

8. Though the Supreme Court expressed some reservation over whether working can be con-

sidered a major life activity under the ADA, *Sutton*, 527 U.S. at 492, 119 S.Ct. 2139, the Second Circuit has accepted the EEOC regulations, 29 C.F.R. § 1630.2(i), defining it as such, *see Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 80 and 83 (2d Cir.2000) ("It is sufficient for us to hold that 'reading' and 'working' are major life activities"), *as cited in Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 64 (2d Cir.2003).

er perceives to substantially impair a major life activity. Defendants' complained of activity in this case (aside from the disclosure of medical information claim) was solely related to the issue of whether plaintiff's condition rendered it safe for him to return to work. In short, it is eminently fair to infer that plaintiff is alleging that RSS regarded his back condition as substantially limiting the major life activity of working.

Thus, the specific question presented with respect to whether plaintiff was regarded as having a disability is whether RSS perceived that his condition would "substantially limit" the major life activity of working. The EEOC regulations interpreting the ADA—to which courts will give "great deference," *Heyman,* 198 F.3d at 72 (citing *Muller v. Costello,* 187 F.3d 298, 312 (2d Cir.1999)—"provide that an individual is substantially limited with respect to working if [he or] she is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes.'" *Bartlett,* 226 F.3d at 83 (quoting 29 C.F.R. § 1630.2(j)(3)(i))).

Taking the facts in the light most favorable to plaintiff, a factual question exists as to whether RSS perceived that plaintiff's back condition substantially limited him in the major life activity of working. Indeed, it is difficult to even reach the inquiry, as RSS flat-out refused to allow plaintiff to work in any capacity for the company, let alone the job he previously held. *See* Docket No. 43, Ex. T ("The employee must be able to return to full duty and to the position he/she left.") It could be argued that this blanket refusal would lead a reasonable juror to conclude that the company did not believe that plaintiff could work any job requiring the same skills, experience, and know-how as his previous position. Further, plaintiff does allege that, due largely to monetary concerns, he did

ask the company if he could work a less physically demanding mill job specifically, and any other job in general. The company refused. Such is enough, at the summary judgment stage, to raise a factual question as to whether the company believed his back condition precluded him from working any job at RSS. *See Ross v. Campbell Soup Co.,* 237 F.3d 701, 706 (6 th Cir.2001) ("Under the 'regarded as' prong of the ADA, membership in the protected class becomes a question of intent. And, as the district court correctly noted, 'that question—i.e., the employer's motive—is one rarely susceptible to resolution at the summary judgment stage").

### 2. *Duty to provide reasonable accommodations*

Even assuming, *arguendo,* that RSS did perceive plaintiff's condition to substantially limit him in his major life activity of working, defendants claim they are still entitled to summary judgment because the company had no duty to assign plaintiff light duty or create a new position for him. If RSS did in fact perceive plaintiff to be substantially limited with respect to work, its flat refusal to provide him with reasonable accommodation would be a violation of the ADA. However, this conclusion is dependent on the identification of possible accommodations, and whether such accommodations are reasonable. In this case, plaintiff unquestionably suggested two accommodations (transfer to another position, and light duty work), and suggested another (modification to slitter machine) either prior to his termination or during this lawsuit.

### a. *light duty*

Nowhere does plaintiff define or identify the contours of what was meant when he requested "light duty," or, perhaps more importantly, whether the term

is meant to be equivalent to an accommodation amounting to modifying the slitter machine, discussed *infra.* It is here found that the two potential accommodations are different. Light duty would have involved relieving plaintiff of some of the *duties* of the slitter position. Since the duties RSS perceived him to have the most trouble with were the physically demanding ones, it is entirely reasonable to reject a request for light duty based on the FCE, as heavy lifting and other physically trying duties would certainly be considered essential job functions for a hot roll slitter operator. *See Gilbert v. Frank,* 949 F.2d 637, 642 (2d Cir.1991) (reasonable accommodation cannot involve elimination of essential job functions). Modifying the slitter machine, on the other hand, would have involved the *alteration of equipment* so as to enable plaintiff to perform those essential functions that RSS believed he could not have otherwise performed.

### b. transfer/reassignment

 With respect to the proposed accommodation of transfer or reassignment to another position, plaintiff has not adduced enough evidence or factual allegations to survive summary judgment. Where a proposed accommodation is reassignment or transfer to another position, a plaintiff has the obligation at summary judgment to come forward with evidence demonstrating that the position sought existed at the time it was requested. *Jackan v. N.Y. State Dep't of Labor,* 205 F.3d 562, 566 (2d Cir.2000). The plaintiff must demonstrate the position open was one with terms and conditions of employment equivalent to that of his prior job, and that the position is vacant within a reasonable amount of time. *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 99 (2d Cir.1999).

If the plaintiff carries fulfills these requirements, the burden of proof shifts to the employer to demonstrate that this proposed accommodation was unreasonable. *Jackan,* 205 F.3d at 566.

Plaintiff has failed to come forward with any evidence that another position existed, or, even if it did, that he was qualified to do it. While skepticism is expressed at defendants' contention that no such position existed, despite at the time the accommodation was suggested not giving this reason, and notwithstanding the company's obligation to search for a position once plaintiff requested a transfer, *see Miller v. Ill. Dep't of Corr.,* 107 F.3d 483, 486–87 (7th Cir.1997) (holding that employer, once aware of disability and request for accommodation, has duty to ascertain if positions are available),[9] plaintiff's obligation to provide at least some evidence or offer at least some factual allegations at the summary judgment stage cannot be excused. Thus, plaintiff cannot argue that a reasonable accommodation was light duty work or a transfer to another position.

### c. equipment modification/adaptation

 This conclusion, however, does not end the inquiry. Another reasonable accommodation suggested by plaintiff in this case involved permitting him to use certain devices he claims were already attached to the slitter machine or otherwise available that would have reduced the physical demands of the position. *See* 42 U.S.C. § 12111(9)(B) (stating that "acquisition or modification of equipment or devices" may be a reasonable accommodation). It is not at all clear that plaintiff suggested this as an accommodation prior to his termination. It is arguable that he did not. For example, in the questionnaire plaintiff filled out

---

9. The Second Circuit has yet to determine if the failure to engage in the interactive process is itself a violation of the ADA. *See Lovejoy-* *Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 219 (2d Cir.2001).

before filing the administrative charge, he was specifically asked what type of reasonable accommodation he requested, to which he answered, "light duty, and or changing jobs because of results of FCE." (Docket No. 43, Ex. B, Part II, Question 1.)

 Nevertheless, it is not incumbent on plaintiff to specifically request any and all accommodations that could possibly be reasonable. "An employee has the initial duty to inform the employer of a disability before ADA liability may be triggered for failure to provide accommodations—a duty dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir.1996). "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9.

 "The regulations do not require, however, that the terminated employee request the specific accommodations that he or she complains the employer did not provide in order to trigger the employer's obligation to investigate the sort of reasonable accommodations that might be appropriate for the employee." *Brown v. Triboro Coach Corp.*, 153 F.Supp.2d 172, 186 (E.D.N.Y.2001) (quoting *Sidor v. Reno*, available at 1997 WL 582846 (S.D.N.Y. Sep.19, 1997)); *see also Young v. Cent. Square Cent. Sch. Dist.*, 213 F.Supp.2d 202, 213 (N.D.N.Y.2002). Thus, so long as the employee makes the employer aware of his condition and that some accommodation is requested, the employer has at least some responsibility to reasonably engage in the interactive process and determine the appropriate accommodation. *See Jacques v. Clean–Up Group, Inc.*, 96 F.3d 506, 514 (1st Cir.1996); *see also Lovejoy*, 263 F.3d at 218 (recognizing that both employer and employee have roles in the interactive process).

Construing the facts in a light most reasonable to plaintiff, as is required at the summary judgment stage, it must be accepted that the slitter machine was equipped with devices that would have lessened the physical demands of the job. Accepting this as true, it would have been patently unreasonable for RSS to not consider this as a possible accommodation, even if plaintiff did not specifically request it prior to his termination. Because the equipment alleged to have been modified was the company's, it was at least constructively aware of the option of utilizing such equipment as part of a potential accommodation. Indeed, not placing a duty upon a plaintiff to specifically request any and all possible accommodations is a rule grounded in common sense. Employers are simply more knowledgeable about adapting or modifying an employee's position, especially since the means to secure such adaptation or modification are most often entirely within their control. The employee should not be required to engage in solitary private investigation to uncover information that the employer may well already know, or have the ability to know with little effort.

RSS, to be sure, did engage in some sort of interaction with plaintiff. It was quite concerned (and laudably so) about plaintiff's safety upon returning to work, and quite properly ordered an FCE to determine his physical capacity for working. As the EEOC determined, however, such concern and such FCE were specifically limited to plaintiff's capacity to return to his same position without restrictions. In

other words, the only interactive efforts made by the company were geared not towards determining the appropriate accommodations, but towards determining his suitability to return to work without any accommodation. Making such a determination is indeed important, but it is only half the battle. The other half is making a determination as to whether, assuming it is determined that the employee cannot return to work without restrictions, there are reasonable accommodations available that would permit the employee to return to work. It is this half that is embodied in the ADA, and it is this half which RSS completely disregarded. Thus, the question in this context is not whether RSS failed to provide plaintiff accommodation—it clearly did—but whether the accommodation that plaintiff alleges was available was reasonable, and whether it would have allowed plaintiff to perform the essential job functions of a slitter operator.

This, of course, by no means disposes of this case. Plaintiff did not move for summary judgment, and the Second Circuit has expressly declined to rule on whether a failure to engage in the interactive process, in and of itself, is a violation of the ADA. *See supra* note 9. The questions remaining, therefore, on the claim for failure to provide accommodation under the ADA are: (1) whether plaintiff can demonstrate that RSS perceived his back condition to substantially limit his ability to work; (2) whether plaintiff can demonstrate that the slitter machine, before his termination, was equipped or reasonably could have been equipped with devices that would have lessened the physical demands of the position to a degree that plaintiff could have performed the essential functions of the job; and (3) if so, whether RSS can demonstrate that such accommodation was unreasonable and/or would impose an undue hardship upon it.

### 3. *Disclosure of confidential medical information*

▮▮▮▮▮ Plaintiff's other claim at issue in the pending motion is that defendants improperly disclosed his confidential medical information in violation of the ADA, 42 U.S.C. § 12112(d). Under Section 12112(d)(4)(A), an employer "shall not require a medical examination and shall not make inquiries of an employee as to ... the nature and severity of [a] disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." All medical information gained as a result of an examination or inquiry must be kept confidential in a separate file by the employer, and can be disclosed only to a limited group of individuals, such as the employee's supervisors or managers, safety personnel, or the government when it is investigating an employer's compliance with the ADA. *Id.* § 12112(d)(3)(B).

Before coming to the primary question of whether plaintiff's confidential medical information was improperly disclosed, it must first be determined whether Section 12112 is even implicated. While requiring plaintiff to take the FCE was surely job-related and consistent with business necessity, and went toward determining the nature or severity of plaintiff's perceived disability, it is not clear that it qualifies as a "medical examination" or "inquiry" so as to trigger the non-disclosure duty.

Though the issue of whether an FCE constitutes a medical examination or inquiry for purposes of Section 12112(d) has yet to be addressed, there are indications that it does. Both the EEOC and case law have indicated that testing ordered by the employer that physically or mentally tests an employee's ability to perform his or her job are permissible tests under the ADA. *See* 29 C.F.R. Pt. 1630, App. § 1630.13(b) (indicating that "fitness for duty exams"

are equivalent to "medical examinations"); *see also Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir.1999) (referring to "mental and physical examinations to determine [an employee's] fitness as a teacher following his allegedly exhibiting some unusual behavior"). Here, the FCE was administered to plaintiff for the sole purpose of determining whether he could physically return to his position as a hot roll slitter operator without any restrictions. It was, in essence and in reality, a fitness for duty exam. The fact that it was administered by a business specializing in physical therapy, and not a medical doctor, makes it no less "medical" than a nurse taking one's blood pressure or an emergency medical technician administering care to a patient on the way to the hospital.

Further, the Second Circuit has recently stated that whether a particular examination or inquiry falls within the statutory section depends on whether it "may tend to reveal a disability." *Conroy v. N.Y. State Dep't of Corr. Serv.*, 333 F.3d 88, 95 (2d Cir.2003) (holding that requiring an employee to receive a "general diagnosis" is sufficient to implicate Section 12112). Here, the FCE was specifically administered to determine whether plaintiff could return to work without restrictions—i.e., whether his back condition physically prevented him, in RSS's eyes, from fulfilling the duties of a hot roll slitter operator.

Even if the FCE cannot be considered a medical examination, it most certainly is an "inquiry" into the severity of plaintiff's alleged disability. Rather than take the traditional form of an inquiry—an employer asking an employee about his disability—the FCE acted as a probing tool into plaintiff's physical suitability to return to his job as a hot roll slitter operator. Thus, no matter how it is classified, the FCE triggered the protections of Section 12112(d) and RSS was prohibited from dis-

closing the confidential medical information learned therefrom.

This brings us to the ultimate question with respect to this claim—whether RSS did in fact disclose confidential medical information to plaintiff's co-employees. Plaintiff alleges that he found out not only the results of the FCE, but specific details therein, including, for example, that he grew short of breath shortly after the FCE began, from his co-employees rather than from RSS. Defendants argue that, because plaintiff signed a release authorizing the disclosure of information generated as a result of the FCE, he "was aware, or should have been aware, that information gathered during the exam would be shared with appropriate Company representatives."

However, the release signed by plaintiff gave his authorization for the dissemination of the information generated as a result of the FCE only to "all professionals that are involved directly in [his] case, for use in [his] rehabilitation." (Docket No. 37, Ex. 8.) Similarly, Section 12112(d) provides only for the release of confidential medical information to supervisors or managers involved in the decisionmaking process with respect to a particular employee. Noting that plaintiff has not moved for summary judgment on this or any other point, there is at least a factual question as to whether plaintiff's co-employees, assuming they received disclosures, fell into either or both of these categories.

Defendants next argue that disclosing the fact that plaintiff failed the FCE, and that he was out of breath during it, was permissible because such information is not confidential or disability-related. If this information is not confidential or disability-related, however, it is difficult to conceive of what defendants would think is. A reasonable trier of fact could certainly conclude that the FCE itself relates

to plaintiff's perceived disability, as do any findings that might inform the perception of that disability, including plaintiff's shortness of breath during the exam. Indeed, as the Second Circuit in *Conroy* indicated, it is the perception of disability that an examination or inquiry causes that the ADA in general, and Section 12112 specifically, protect as much an actual disability. 333 F.3d at 95; *see also Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 99 (2d Cir.2003) (" 'Society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment' ") (quoting *Sch. Bd. of Nassau County v. Arline*, 480 U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)).

Thus, as to this ADA claim, there are factual questions as to: (1) whether a disclosure did occur; (2) whether plaintiff's co-workers, if they received such a disclosure, were appropriate company representatives or supervisors/managers entitled to receive such information within the meaning of Section 12112(d); and (3) whether any information disclosed was confidential and disability-related.[10]

## IV. CONCLUSION

Plaintiff has consented to the dismissal of his Title VII and ADEA claims, and as to the dismissal of defendants Impact and Cindy Bush. Plaintiff cannot maintain his ADA claims against individual moving defendants Hinman, Pratt, and Race, though they do remain in the case as defendants with respect to plaintiff's claim under the New York Human Rights Law.[11] As to RSS, plaintiff has adduced sufficient evidence and factual allegations to survive summary judgment on both of his ADA claims.

Accordingly, it is

ORDERED that

1. The complaint is DISMISSED against defendants Impact and Cindy M. Bush;

2. The Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1969 claims are DISMISSED;

3. Defendants' Kirk Hinman, Roger Pratt, and Walter Race motion for summary judgment on plaintiff's ADA claims is GRANTED;

4. The ADA claims are DISMISSED against defendants Kirk Hinman, Roger Pratt, and Walter Race; and

5. Defendant Rome Strip Steel Co, Inc.'s motion for summary judgment on plaintiff's ADA claims is DENIED.

IT IS SO ORDERED.

---

10. Defendants also argue that this claim must be dismissed because plaintiff has failed to prove he was injured by any disclosures. Plaintiff, however, claims that the disclosures "further exacerbated [his] stress, emotional pain and suffering, and distress." (Docket No. 40, p. 6.) Defendants will be permitted at trial to explore this claim.

11. Even though individuals are obviously the parties that effect discrimination on an employee, under the New York Human Rights Law the employer is the entity deemed responsible therefor, and the individuals, assuming they actually participated in the discrimination, may be held liable as aiders and abettors to the employer's discrimination. *See Bennett v. Progressive Corp.*, 225 F.Supp.2d 190, 213–15 (N.D.N.Y.2002).