# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-1496

_____

| | | |
|---|---|---|
| Jan Thomas, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Jim Corwin, Chief of the Kansas City, | * | |
| Missouri Police Department; Karl | * | |
| Zobrist, President, Board of Police | * | |
| Commissioners of Kansas City, | * | |
| Missouri; Javier M. Perrez, Vice | * | |
| President, Board of Police | * | Appeal from the United States |
| Commissioners of Kansas City, | * | District Court for the |
| Missouri; Angela Wasson-Hunt, | * | Western District of Missouri. |
| Treasurer, Board of Police | * | |
| Commissioners of Kansas City, | * | |
| Missouri; James Wilson, Member of | * | |
| the Board of Police Commissioners | * | |
| of Kansas City, Missouri; Mayor Kay | * | |
| Barnes, Mayor and Member of the | * | |
| Board of Police Commissioners of | * | |
| Kansas City, Missouri, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: October 19, 2006
Filed: April 3, 2007

_____

Before WOLLMAN, RILEY, and GRUENDER, Circuit Judges.
_____

RILEY, Circuit Judge.

Jan Thomas (Thomas) appeals from the district court's[1] grant of summary judgment on her claims of disability discrimination under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101–12213; age discrimination under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634; gender discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e–2000e-17; retaliation[2] under the ADA and Title VII; and invasion of privacy under Missouri state law. Finding no error, we affirm.

## I.    BACKGROUND

Thomas began working for the Kansas City Police Department (KCPD) in 1977. In 1989, she began working the evening shift in the Juvenile Unit as an investigative typist. Sergeant Janet Hargarten (Hargarten) became Thomas's direct supervisor in late 1996 or early 1997. In October 1999, Thomas transferred to another KCPD division to work the day shift, but within a few months Thomas requested return to her former evening shift position in the Juvenile Unit. Thomas's request was approved in early 2000. At the time of her request, Thomas recognized the Juvenile Unit had some workforce shortages.

_____

[1]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri.

[2]In the district court, Thomas also asserted the defendants retaliated against her in violation of the ADEA. The district court granted summary judgment on Thomas's retaliation claim under the ADEA, and Thomas does not challenge this ruling on appeal.

When Thomas returned to the Juvenile Unit, Hargarten and Thomas reviewed the office procedures and vacation policy, which limited vacations to no more than sixteen consecutive days. However, on May 30, 2000, Thomas submitted a request to take twenty consecutive days of vacation in September 2000. Noting their earlier discussion regarding the vacation policy, Hargarten denied Thomas's request and asked her to resubmit it. Hargarten later approved Thomas's subsequent request of seventeen days' vacation.

On May 31, 2000, Thomas met with Hargarten to discuss the vacation issue, and Thomas expressed concerns regarding safety and security within the Juvenile Unit. During this meeting, Thomas informed Hargarten she felt she was treated differently than male employees, because men were allowed to carry guns and Thomas was not even allowed to use pepper spray. Thomas alleges Hargarten told her to think carefully about filing a grievance regarding her concerns.

On July 26, 2000, Thomas fell asleep at her desk while on duty. The following day, Hargarten asked Thomas to complete a Form 191 explanatory memorandum detailing the incident, but Hargarten did not formally discipline her.[3] Thomas claims other Juvenile Unit employees, including younger male employees, fell asleep at their desks, but they were never required to fill out a Form 191.

A few weeks later on August 9, 2000, Thomas arrived thirty minutes late to a staff meeting. Hargarten again asked Thomas to complete a Form 191, but Hargarten did not discipline Thomas for her tardiness. At that time, Hargarten told Thomas that Detective Jackson Lyle (Lyle) had to complete a Form 191 for similar conduct the previous year. However, Thomas alleges Lyle later stated he did not have to fill out a Form 191. Hargarten testified Lyle, in fact, did complete a Form 191, but he simply did not remember doing so.

---

[3]KCPD argues a Form 191 is not a form of disciplinary action, and Thomas admits a Form 191 may be used to commend an employee for positive conduct.

In January 2001, Thomas submitted a request for thirty-two consecutive vacation days. No other Juvenile Unit employee had ever been granted a similar request. Hargarten denied the request and asked Thomas to resubmit the request in accordance with the Juvenile Unit's vacation policy; Thomas did not do so. Thomas acknowledged she also received a memorandum prepared by Hargarten that sought to limit the length of vacations due to workforce shortages within the Juvenile Unit.

On February 20, 2001, Thomas met with Hargarten and Captain Byron Price (Price) to discuss her vacation request and the effects of extended vacations on the operation of the Juvenile Unit, a small division requiring twenty-four-hour staffing. During the meeting, Hargarten stated Thomas could be written up for insubordination for requesting thirty-two consecutive days of vacation. Hargarten also stated detectives in the Juvenile Unit had complained about Thomas's conduct, which included going into a back room to talk on the telephone, hiding her computer screen when others walked by, faxing information to her husband while at work, and coming to the Juvenile Unit on her days off.[4] Hargarten then intimated Thomas's behavior could give rise to a hostile work environment claim by Thomas's co-workers and Thomas could be disciplined for her behavior. Finally, Hargarten again advised Thomas to be careful regarding the filing of a grievance with KCPD.

On April 23, 2001, Thomas received her employee evaluation for the period from May 5, 2000, to May 5, 2001. The evaluation, completed by Hargarten, discussed Thomas's professional manner in dealing with upset parents and her willingness to assist Juvenile Unit detectives with their workload, but the evaluation also noted some "unusual" behavior, such as falling asleep on duty and being late to a staff meeting. The evaluation noted the recommendation that Thomas seek medical advice regarding her alleged fatigue. Thomas signed the agreement, which gave her

---

[4]The record is unclear regarding who allegedly complained to Hargarten regarding Thomas's conduct. However, the record indicates at least three Juvenile Unit employees did not have any complaints regarding Thomas.

-4-

a "satisfactory" rating, the only alternative rating being "unsatisfactory."  Employee evaluations do not become part of an employee's permanent personnel file.

On May 22, 2001, Thomas returned home from work and then went to the emergency room, believing she was having a heart attack.  Thomas was advised she was experiencing an anxiety reaction.  The next day, Thomas sought treatment from Dr. Bernard Judy (Dr. Judy), her primary care physician.  Dr. Judy believed Thomas was experiencing "job-related stress," and referred her to Dr. Bernard Sullivan (Dr. Sullivan), a psychologist.  Thomas called the Juvenile Unit and requested a sick day, stating she had been to the hospital the night before for stress and had a doctor's appointment scheduled for the following day.  When Hargarten called Thomas later that evening and inquired about the cause of Thomas's stress, Thomas indicated she likely would return to work on May 24, 2001.  Thomas did not come to work on this date.

On May 24, 2001, Dr. Sullivan diagnosed Thomas with stress and anxiety due to work-related pressures and excused Thomas from work through June 3, 2001.  When Thomas informed Hargarten of this on May 25, 2001, Hargarten inquired about what work-related pressures Thomas had been experiencing.  Thomas refused to explain the cause of her stress.  Hargarten contacted Thomas at home on two other occasions to see how Thomas was feeling.  A series of notes from Dr. Sullivan excused Thomas from work due to Thomas's work-related stress and anxiety, and extended Thomas's return to work from June 3 to June 10, and finally to June 17, 2001.

On June 13, 2001, Thomas called Hargarten, stating Dr. Sullivan cleared Thomas to return to work on June 18, 2001.  Hargarten replied she was recommending Thomas's transfer to KCPD's sick leave pool[5] and that Thomas undergo a fitness-for-

---

[5]Pursuant to KCPD policy, employees can be transferred to the "sick leave pool" when their "sick leave [is] anticipated to last for twenty-eight or more

duty (FFD) evaluation. KCPD policy provides a supervisor must submit a written request recommending a psychological or psychiatric examination to evaluate an employee's FFD if the employee exhibits symptoms of a psychological or psychiatric disorder that is believed to affect job performance. In a memo dated June 12, 2001, Hargarten recommended Thomas undergo an FFD due to (1) Thomas's absences from work, (2) Thomas's refusal to discuss her work-related stress, and (3) KCPD's potential liability if Thomas were allowed to return to work without an evaluation. On June 28, 2001, Thomas received a letter from Captain Philip Lawler (Lawler) of the Employee Benefits Unit stating that KCPD had placed her in the sick leave pool effective June 25, 2001.

In late June 2001, Barbara Stuart (Stuart), supervisor of KCPD's Human Resources Division Employee Benefits Unit, informed Thomas she had scheduled Thomas's psychological FFD evaluation for July 5, 2001; Thomas agreed to participate and understood KCPD would allow her to return to work if she completed the evaluation. Dr. George Harris (Dr. Harris), an independent licensed psychologist who spends about 80% of his professional time with clients from KCPD, performed Thomas's FFD evaluation. KCPD's usual practice is to inform the doctor performing an employee's FFD evaluation generally of the employee's problem or issue. KCPD sent Dr. Harris several items: a referral letter noting Thomas was scheduled for a psychological FFD evaluation; a copy of the letter sent to Thomas regarding her assignment to the sick leave pool; a copy of Hargarten's June 12, 2001, memo discussing Thomas's absences from work and recommending Thomas's transfer to the sick leave pool; an informational log detailing Thomas's stress-related leave from work; notes to KCPD from Dr. Sullivan excusing Thomas from work; and a chart listing Thomas's absences from work. Although KCPD did not provide Dr. Harris with any specific questions to direct to Thomas during the evaluation, Dr. Harris

consecutive calendar days." Hargarten anticipated that since Thomas would be on sick leave for at least twenty-six days before she could be evaluated by any KCPD physician, Thomas's absence could easily go over the twenty-eight day mark.

assumed, based on the referral letter and accompanying documents he received, that he was to determine whether any psychological problems interfered with Thomas's ability to return to work.

On July 5 and 10, 2001, Dr. Harris interviewed Thomas and administered a psychological test. Thomas also completed a medical history questionnaire, in which she failed to mention she previously had taken anti-depressant medications. Dr. Harris asked Thomas to sign a medical release form so he could obtain Thomas's medical records. Thomas initially objected, but eventually permitted Dr. Harris to review information concerning her mental health and physical treatment for the time-period from May 22 through July 10, 2001. Those records indicated (contrary to Thomas's medical history questionnaire) Thomas previously had taken Prozac and Zoloft. Thomas stated the medications were prescribed for fatigue, an explanation Dr. Harris doubted based on his belief Prozac and Zoloft typically were prescribed for anxiety and depression, and Dr. Harris told Thomas he did not believe her.

On July 11, 2001, Thomas submitted a nine-page, single-spaced grievance to KCPD based upon Thomas's concerns regarding the vacation policy, security issues, and allegations Hargarten was treating her more harshly than others. Thomas's grievance also included claims of increased monitoring of her activities by Hargarten, disparate treatment of her based on gender, and Hargarten's creation of self-serving memoranda criticizing Thomas.

Based on his evaluation of Thomas, in an initial report dated July 19, 2001, Dr. Harris opined that although Thomas did not appear to have any major psychological disorder, he could not recommend Thomas return to work absent some indication of effective medical intervention for her anxiety or a change in working conditions to resolve Thomas's complaints within the Juvenile Unit. Dr. Harris reported he could not issue a final report without access to Thomas's medical records. He noted, "if Ms. Thomas is experiencing an anxiety disorder . . . severe enough to disrupt her work . . . it would be reasonable to expect [Thomas] to begin medication for the condition."

Based on Dr. Harris's belief Thomas was not taking any medications, Dr. Harris would not recommend Thomas return to work unless her physician indicated medication was unnecessary. He opined Thomas's reluctance to completely disclose her medical records might indicate other reasons for Thomas's alleged work-related stress and anxiety, viewing Thomas's complaints about her safety at the Juvenile Unit "disproportional to the problem." Dr. Harris alternatively noted Thomas's alleged anxiety "could be . . . somewhat manipulative, designed to get time off that she couldn't get approved through normal procedures," and concluded examination of additional medical records might clarify the issue. Dr. Harris also expressed his inability to explain Thomas's drowsiness, again noting his desire to examine Thomas's medical records for evidence of any anxiety disorder.

On August 13, 2001, Dr. Harris asked Thomas to sign a medical records release form, authorizing Dr. Judy to release Thomas's records from 1996, when Dr. Judy prescribed Prozac and Zoloft to Thomas. Dr. Harris stated he needed to know why Thomas was given those medications. Thomas refused to sign the release form. Although Thomas did not know specifically what information her medical records contained, during her deposition Thomas testified she was worried the records might reference her infertility problems and did not want others to have access to such information. Thus, rather than sign the release form, Thomas asked Dr. Judy to prepare a letter to Dr. Harris in which Dr. Judy explained Prozac and Zoloft were prescribed for Thomas's fatigue and Thomas's "symptoms were not related to her present problems of anxiety and depression."

Upon receiving Dr. Judy's letter, Dr. Harris informed KCPD he could not allow Dr. Judy's cursory statements to create Dr. Harris's opinion regarding Thomas's psychological difficulties. Dr. Harris noted his belief that treating fatigue with anti-depressant medications was unusual, opining "Thomas's treatment history suggests a predisposition to psychological difficulties—tendencies which probably play some role in understanding her present condition." Dr. Harris felt "there were too many conflicting pieces of information" and "wasn't sure [he] was getting the complete

truth" from Thomas. He also was concerned about clearing Thomas for return to work when no changes had been made to the work environment, which Thomas alleged was the sole cause of her stress and anxiety. Dr. Harris also noted his repeated attempts to encourage Thomas to sign the release form and Thomas's refusals to do so. Noting it was "highly unlikely" Dr. Judy had performed a complete psychological examination of Thomas and it was "reasonable to suspect . . . Thomas could withhold information from Dr. Judy about [Thomas's] present circumstances" just as Thomas was withholding information from Dr. Harris about her past condition, Dr. Harris concluded he could not recommend Thomas return to work.

Given Thomas's refusal to sign the release form, Stuart asked Thomas to meet with her and Lawler. During this October 3, 2001 meeting, Lawler indicated his assumption Thomas would not change her mind and sign the release form. Lawler also stated a KCPD attorney had recommended Thomas be terminated. Although not expressly ordered to sign the release form, Thomas was advised Dr. Harris needed specific medical records to determine her FFD, and KCPD would have no choice but to terminate her if she did not release her records. Thomas confirmed she had no intention of signing the release.

Approximately one month later, KCPD requested Thomas sign a personnel incident report, which stated Thomas had been advised Dr. Harris, "the department-authorized psychologist," needed Thomas's medical records to determine her FFD. The report further stated Thomas repeatedly refused to release the records, in violation of KCPD's rules of conduct, which required employees to "obey all lawful and proper orders and instructions issued by a supervisor/commander regardless of the manner by which they are transmitted or received." Thomas signed the incident report on November 7, 2001, and then Thomas submitted a six-page, single-spaced response raising many issues, but acknowledging she refused requests to release her medical records before May 22, 2001. KCPD terminated Thomas effective December 4, 2001, for failure to follow an order. Thomas took accumulated sick leave from May 22,

2001, until December 4, 2001. KCPD replaced Thomas with a younger female employee.

During the course of later settlement negotiations, Thomas's attorney provided KCPD with Thomas's 1996 medical records. The records revealed that in 1996, Thomas admitted to Dr. Judy she was "possibly depressed." Dr. Judy testified in his deposition he did not remember reviewing Thomas's 1996 medical records before writing his August 2001 letter to Dr. Harris, but instead adopted Thomas's suggestion the Prozac and Zoloft medications were prescribed for fatigue because it did not conflict with his own recollection. Furthermore, the only mention of information related to Thomas's "infertility" was her previous tubal ligation and subsequent reversal, and Thomas's intermittent attempts to get pregnant. Thomas had disclosed her prior tubal ligation and reversal surgeries to Dr. Harris on her medical history questionnaire, and Thomas had discussed with Hargarten and her other Juvenile Unit co-workers Thomas's desire to have children, her fertility treatments, and her attempts to become pregnant.

Thomas filed suit against Jim Corwin, KCPD Chief of Police; KCPD; and five members of the Board of Police Commissioners (collectively, the defendants), alleging disability discrimination, age discrimination, gender discrimination, retaliation, invasion of privacy, and intentional and negligent infliction of emotional distress. The district court dismissed the emotional distress claims with prejudice and also dismissed KCPD as a defendant. The district court granted summary judgment to the defendants on Thomas's remaining claims. Thomas appeals.

## II.  DISCUSSION

### A.  Standard of Review

We review de novo the grant of a motion for summary judgment, applying the same standards as the district court.  Samuels v. Kan. City Mo. Sch. Dist., 437 F.3d 797, 801 (8th Cir. 2006).  If the evidence, viewed in the light most favorable to Thomas and giving her the benefit of all reasonable inferences, shows there are no genuine issues of material fact and the defendants are entitled to judgment as a matter of law, then summary judgment is appropriate.  Fed. R. Civ. P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  In considering a motion for summary judgment, we do not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.  Peter v. Wedl, 155 F.3d 992, 996 (8th Cir. 1998).  Rather, we view the facts and evidence as a whole in the light most favorable to the nonmoving party.  Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 845 (8th Cir. 2006). The party opposing summary judgment cannot rest solely on the pleadings, but instead must set forth specific facts showing there is a genuine issue of material fact for trial.  Celotex Corp., 477 U.S. at 324.  Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment.  See id.

### B.  ADA Discrimination Claim

Thomas first argues the district court erred in granting summary judgment on Thomas's ADA discrimination claim under 42 U.S.C. § 12112(d)(4)(A), which prohibits an employer from requiring a medical examination or inquiring into the disability status of an employee "unless such examination or inquiry is shown to be job-related and consistent with business necessity."  This provision applies to all employees, regardless of whether the employee has an actual disability. See Cossette v. Minn. Power & Light, 188 F.3d 964, 969 (8th Cir. 1999).

To demonstrate compliance with § 12112(d)(4)(A), the employer bears the burden to show the asserted "business necessity" is vital to the business and the

request for a medical examination or inquiry is no broader or more intrusive than necessary. Conroy v. N.Y. State Dep't of Corr. Servs., 333 F.3d 88, 97-98 (2d Cir. 2003). "[C]ourts will readily find a business necessity if an employer can demonstrate . . . a medical examination or inquiry is necessary to determine . . . whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties (such as frequent absences . . . )," or "whether an employee's absence or request for an absence is due to legitimate medical reasons, when the employer has reason to suspect abuse of an attendance policy." Id. at 98; see, e.g., Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 811 (6th Cir. 1999) (holding "there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job" to uphold an employer's request for an exam). The examination or inquiry need not be the *only way* to achieve a business necessity, but it must be a reasonably effective method to achieve the employer's goals. Conroy, 333 F.3d at 98.

Our review of the record convinces us the defendants' request for Thomas's FFD evaluation was "job-related and consistent with business necessity." See 42 U.S.C. § 12112(d)(4)(A). As a Juvenile Unit employee, Thomas interacted with the parents or guardians of troubled children, assisted Juvenile Unit detectives, and served in a back-up security capacity. Thomas previously communicated to the defendants her concerns regarding the Juvenile Unit's work situation and safety. Thereafter, Thomas visited the emergency room for an anxiety attack, a condition her primary care physician and psychologist attributed solely to "work-related stress and anxiety," and which necessitated a three-week leave of absence. During this time-period, Hargarten unsuccessfully attempted to ascertain the cause of Thomas's work-related stress. Thomas then proposed to return to her same position in an unchanged environment, despite her repeated refusal to articulate the basis for her work-related stress. On these facts, KCPD had legitimate reasons (1) to doubt Thomas's capacity to perform her work duties without being overcome by stress and anxiety, (2) to take proactive steps to ensure the safety of the public, Thomas and other Juvenile Unit

employees, and (3) to seek reliable attendance from Thomas, an employee within a small division requiring twenty-four-hour staffing. See Conroy, 333 F.3d at 98 (noting an employer's legitimate business necessity may include safety and reducing severe absenteeism).

Furthermore, KCPD's request for an FFD evaluation was no broader or more intrusive than necessary. Employers are permitted "to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims." Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir. 1998). Pursuant to the FFD evaluation, in which Thomas agreed to participate, KCPD sought to ascertain whether Thomas was fit to return to a position under the same working conditions that allegedly caused Thomas stress and anxiety severe enough to mandate a trip to the emergency room, followed by an extended three-week absence from work. KCPD directed Dr. Harris to determine whether any psychological problems interfered with Thomas's ability to return to work. During the course of Dr. Harris's evaluation, he learned Thomas previously had taken anti-depressant medications, information omitted from Thomas's medical history questionnaire. Doubting Thomas's explanation that the medications were prescribed for fatigue, Dr. Harris sought to determine whether Thomas's medical history explained her current psychological condition. However, Thomas repeatedly refused to comply with Dr. Harris's focused request for a limited portion of Thomas's medical records, which refusal led Dr. Harris to believe there were other reasons for Thomas's work-related stress and anxiety. We agree with the district court that examining Thomas was vital to operating the Juvenile Unit, and the focused request for a limited portion of Thomas's medical records was no broader or more intrusive than necessary.

In addition, we have reviewed Thomas's remaining arguments regarding this claim and find each to be meritless. Summary judgment therefore is proper on Thomas's ADA claim.

-13-

**C.    Age Discrimination Claim**

The ADEA prohibits employers from discriminating against employees on the basis of age.  29 U.S.C. § 623(a)(1).  To establish a prima facie claim of age discrimination, Thomas must show (1) she was at least forty years old, (2) she was meeting her employer's legitimate performance expectations, (3) she suffered an adverse employment action, and (4) similarly-situated employees outside the class were treated more favorably.  See Haas v. Kelly Servs., Inc., 409 F.3d 1030, 1035 (8th Cir. 2005).  Because Thomas presented no direct evidence of discrimination, we analyze her claim pursuant to the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Once Thomas establishes a prima facie case, the burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for their actions.  If the defendants satisfy their burden, the burden shifts back to Thomas to show the defendants' proffered reason was pretextual.  McDonnell Douglas, 411 U.S. at 802, 804.

Thomas alleges three discriminatory acts: (1) the required filing of Form 191s and her employee evaluation, (2) her required participation in an FFD evaluation, and (3) her termination.  The defendants concede, for purposes of argument, Thomas satisfies the first two elements of her prima facie case.

Thomas first claims the required filing of Form 191s and the subsequent mention on her employee evaluation of the Form 191s' subject matter constitute adverse employment actions. Such an assertion lacks merit. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." Wedow v. City of Kan. City, Mo., 442 F.3d 661, 671 (8th Cir. 2006) (quotation omitted). "A negative performance review is not in itself an adverse employment action . . . and it is actionable only if the employer subsequently uses that review to alter the terms or conditions of employment to the detriment of the employee." Burchett v. Target Corp., 340 F.3d 510, 518 (8th Cir. 2003).  Although Thomas was required to fill out a Form 191 twice as a result of falling asleep and being tardy to work, and both of these incidents appeared on her employee

evaluation–an evaluation on which Thomas received a "satisfactory" rating–Thomas suffered no disciplinary action or material change in her working conditions as a result. Furthermore, evaluations do not become part of the KCPD employee's permanent personnel file, and there is no indication the defendants used Thomas's evaluation as a basis to alter detrimentally the terms or conditions of Thomas's employment. See Spears v. Mo. Dep't of Corr. and Human Res., 210 F.3d 850, 854 (8th Cir. 2000).

Additionally, Thomas fails to show KCPD's requirement for her to undergo an FFD evaluation was related to her age. Thomas points to no evidence indicating similarly-situated younger employees were treated more favorably than she. Further, even assuming Thomas could establish a prima facie case of age discrimination with regard to the FFD evaluation, we conclude the defendants proffered legitimate, nondiscriminatory reasons for their actions, and Thomas fails to demonstrate the defendants' proffered reasons were a mere pretext for discrimination.

Finally, Thomas puts forth a prima facie case of discriminatory discharge under the ADEA because she is at least forty years of age, was terminated by KCPD, was meeting KCPD's legitimate performance expectations, and was replaced by a younger employee. See Haas, 409 F.3d at 1035. Thus, the burden shifts to the defendants to articulate a legitimate, nondiscriminatory reason for their actions. By refusing to provide Dr. Harris the opportunity to review her medical records and to discover the root of Thomas's stress and anxiety, Thomas created a stalemate in which KCPD had little choice but to terminate Thomas rather than return her to the position from which Thomas's stress and anxiety originated. Thomas's refusal to cooperate with the reasonable requirements of her FFD evaluation and her violation of KCPD's rules of conduct provided the defendants with legitimate, nondiscriminatory reasons to terminate Thomas.

Because KCPD met its burden of production, the presumption of unlawful discrimination disappears, and the burden shifts to Thomas to demonstrate KCPD's

articulated reasons for termination were a pretext for intentional age discrimination. See Mayer v. Nextel W. Corp., 318 F.3d 803, 807 (8th Cir. 2003). Thomas "can avoid summary judgment only if the evidence considered in its entirety (1) created a fact issue as to whether [KCPD's] proffered reasons are pretextual *and* (2) created a reasonable inference that age was a determinative factor in the adverse employment decision." Haas, 409 F.3d at 1035 (quotation omitted). Thomas fails to do so, and she presents no evidence, other than her replacement by a younger woman, indicating KCPD's proffered reasons for her termination were a pretext for age discrimination. For these reasons, the district court properly granted summary judgment to the defendants on Thomas's age discrimination claim.

### D. Gender Discrimination Claim

To establish a prima facie case of gender discrimination, Thomas must show she (1) was a member of a protected class, (2) was qualified to perform her job, (3) suffered an adverse employment action, and (4) was treated differently from similarly-situated male employees. See Hesse v. Avis Rent A Car Sys., Inc., 394 F.3d 624, 631 (8th Cir. 2005). Because Thomas fails to present direct evidence of discrimination, we review her claim under the McDonnell Douglas analytical framework. Thomas alleges she was treated differently than male employees based on Hargarten requiring Thomas to complete two Form 191s for being tardy and falling asleep at work while not requiring male employees engaged in similar conduct to complete Form 191s. In rejecting Thomas's claim, the district court concluded Thomas failed to satisfy the third and fourth elements of her prima facie case. We agree.

First, Thomas fails to show she suffered an adverse employment action. As noted previously, Thomas suffered no disciplinary action or material change in her working conditions as a result of being required to complete two Form 191s. KCPD never used the Form 191s or Thomas's employee evaluation, which mentioned the sleeping and tardiness incidents yet ultimately gave Thomas a "satisfactory" rating, to alter negatively the terms and conditions of Thomas's employment or to terminate

-16-

Thomas. <u>See</u> <u>Spears</u>, 210 F.3d at 854 (holding even a poor performance rating does not, in itself, constitute an adverse employment action unless the employer uses the evaluation as a basis to alter detrimentally the terms or conditions of the recipient's employment).

Additionally, Thomas alleges she was treated differently than similarly-situated male employees by virtue of her receipt of lower evaluations and her required completion of Form 191s. However, Thomas provides no concrete evidence of specific events in support of this assertion, beyond Thomas's own conclusory allegations. Such skeletal allegations, unsupported with specific facts or evidence, are insufficient to create a genuine issue of fact so as to preclude granting summary judgment. Thus, the defendants are entitled to summary judgment on Thomas's gender discrimination claim.

### E.     Retaliation Claim

Thomas argues the defendants retaliated against her in violation of the ADA and Title VII. To establish a prima facie case of retaliation, Thomas must demonstrate (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between the protected activity and the adverse employment action. <u>See</u> <u>Box v. Principi</u>, 442 F.3d 692, 696 (8th Cir. 2006) (citation omitted). Because Thomas presented no direct evidence of retaliation, we analyze her claim pursuant to the <u>McDonnell Douglas</u> burden-shifting analysis.

Thomas alleges she engaged in protected activity "on many occasions in 2000," including: (1) during a May 2000 meeting, when Thomas voiced her concerns about discriminatory treatment and safety issues; (2) during a February 2001 meeting with Hargarten and Price; (3) during a meeting with Dr. Harris on July 10, 2001, when Thomas objected to Dr. Harris's request for her medical records; (4) on July 11, 2001, when Thomas filed a grievance with KCPD's Human Resources Division; and (5) in October 2001, when Thomas again refused Dr. Harris's request for her medical

records. Additionally, Thomas argues her FFD evaluation and her termination constitute adverse employment actions.

We will assume, for purposes of argument, that Thomas's FFD evaluation, requested by the defendants in June 2001, constitutes an adverse employment action, and that Thomas's complaints regarding discriminatory treatment within the Juvenile Unit constitute protected activity. Nevertheless, we conclude Thomas fails to demonstrate any causal connection between the alleged protected activities and the retaliatory conduct. To prove a causal connection, Thomas must demonstrate the defendants' "retaliatory motive played a part in the adverse employment action." Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 896-97 (8th Cir. 2002) (quotation omitted). Evidence giving rise to an inference of retaliatory motive on the part of the employer is sufficient to establish the requisite causal link. Id. at 897. "An inference of a causal connection between [protected conduct] and [an adverse employment action] can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1119 (8th Cir. 2006) (citation omitted). In this case, the FFD evaluation request in June 2001 directly followed Thomas's three-week absence from work due to "work-related stress." There is no allegation Thomas engaged in protected activity on some date close in time to KCPD's FFD evaluation request, and Thomas fails to put forth sufficient evidence supporting an inference of retaliatory motive on the part of the defendants. Furthermore, even if Thomas could put forth a prima facie case, the defendants proffered legitimate, nondiscriminatory reasons for requesting the FFD evaluation, which Thomas fails to rebut.

We reach a similar conclusion with regard to Thomas's termination, which unquestionably constitutes an adverse employment action. The defendants terminated Thomas based on (1) Thomas's refusal to cooperate with the requirements of the FFD evaluation and to submit her medical records to Dr. Harris, (2) Dr. Harris's reluctance to recommend Thomas's return to work without reviewing those records, (3) KCPD's

-18-

hesitancy to return Thomas to a position and an environment that caused Thomas to visit the hospital emergency room and to take a three-week leave of absence due to work-related stress and anxiety, and (4) Thomas's violation of KCPD's rules of conduct. Thomas did not engage in statutorily protected conduct by opposing Dr. Harris's legitimate, focused request for Thomas's medical records, a request both job-related and consistent with a business necessity. But even if Thomas established a prima facie case, the defendants offered legitimate reasons for terminating Thomas, which Thomas fails to rebut with evidence of pretext. Summary judgment in the defendants' favor is proper on Thomas's retaliation claim.

### F.     Invasion of Privacy Claim

Thomas alleges the defendants invaded her privacy under Missouri common law under the theory of unreasonable intrusion upon the seclusion of another. To succeed on such a claim, Thomas must demonstrate (1) the existence of a secret and private subject matter, (2) the plaintiff's right to keep that subject matter private, and (3) the obtainment by the defendant of information about that subject matter through unreasonable means. St. Anthony's Med. Ctr. v. H.S.H., 974 S.W.2d 606, 609-10 (Mo. Ct. App. 1998) (citation omitted). Thomas alleges the defendants intruded upon her seclusion by requiring her to undergo an FFD evaluation "that requisitioned full access to her past medical treatments and a completely unjustified psychological exam," and by "demanding her medical records under the threat of termination."

Even assuming Thomas satisfies the first two elements of her prima facie case, a feat we question given Thomas's open discussion of her fertility treatments with her co-workers and Thomas's voluntary revelation of her tubal ligation medical information on the initial questionnaire she completed for Dr. Harris, Thomas fails to demonstrate a genuine issue of material fact on whether the defendants obtained information about a private subject matter through unreasonable means. A plaintiff cannot establish the defendant's use of "unreasonable means" to obtain information if a defendant obtains such information in the ordinary course of business or in response to a discovery request during litigation. See id. at 610. Here, the defendants

-19-

received Thomas's medical records only after Thomas's attorney *voluntarily* produced the records during the course of settlement negotiations. Obtaining information in such a manner can hardly be characterized as a method "objectionable to a reasonable person." See Brown v. Mullarkey, 632 S.W.2d 507, 510 (Mo. Ct. App. 1982) (holding the plaintiff could not prevail on an intrusion upon seclusion claim where the defendants used a subpoena duces tecum to request the information).

Moreover, we reject Thomas's argument that merely being forced to undergo the FFD evaluation under the threat of termination, regardless whether the defendants actually obtained private information, constitutes an invasion of her privacy. Rather, KCPD acted reasonably in requesting Thomas undergo a legitimate FFD evaluation to determine Thomas's ability to return to work, and nothing in the record suggests the defendants threatened termination to intimidate or harass Thomas. There is no allegation the defendants engaged in threats or deception in requiring Thomas's FFD evaluation. Any information revealed to the defendants pursuant to the evaluation appears to have been done voluntarily by Thomas. For these reasons, summary judgment is proper on Thomas's invasion of privacy claim.

### G. Denial of Thomas's Motion to Amend Complaint

On the final day allowed under the district court's scheduling order for filing amended pleadings, Thomas moved to amend her first amended complaint, seeking to add the state law invasion of privacy claim. Over one month later, Thomas sought to modify this motion by adding a claim pursuant to 42 U.S.C. § 1983 for "the deprivation of [Thomas's] constitutional right to privacy by a state actor or for retaliation." The district court granted Thomas's first motion to amend, but the court denied the modified motion on the ground the motion came well after the scheduling order's deadline to amend the pleadings and the additional § 1983 claim was not reasonably contemplated in Thomas's initial motion for leave to amend.

On appeal, Thomas challenges the district court's denial of her modified motion to amend, which we review for abuse of discretion. See United States ex rel. Joshi v.

St. Luke's Hosp., Inc., 441 F.3d 552, 555 (8th Cir.), cert. denied, 127 S. Ct. 189 (2006) (standard of review). "When the district court has filed a . . . pretrial scheduling order, it may properly require that good cause be shown for leave to file an amended pleading that is substantially out of time under that order." Freeman v. Busch, 349 F.3d 582, 589 (8th Cir. 2003) (quotation omitted). On appeal, Thomas provides no good cause to explain why her modified motion to amend the complaint was filed so late. Additionally, we agree with the district court that Thomas's timely motion to amend did not reasonably contemplate all elements of a § 1983 claim. Thus, the district court was well within its discretion in denying Thomas's modified motion to amend.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

_____