**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

Kris Indergard,
          *Plaintiff-Appellant,*

v.

Georgia-Pacific Corporation,
          *Defendant-Appellee.*

No. 08-35278

D.C. No.
3:06-CV-01317-
ALH-PP

OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, District Judge, Presiding

Argued and Submitted
June 4, 2009—Portland, Oregon

Filed September 28, 2009

Before: Alfred T. Goodwin, Diarmuid F. O'Scannlain, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Goodwin;
Dissent by Judge O'Scannlain

## COUNSEL

Kerry M.L. Smith, Smith & Fjelstad, Gresham, Oregon, for the plaintiff-appellant.

Scott G. Seidman, Tonkon Torp, Portland, Oregon, for the defendant-appellee.

**OPINION**

GOODWIN, Circuit Judge:

Kris Indergard ("Indergard") appeals a summary judgment in favor of Georgia-Pacific Corporation ("GP") in her action for damages under the Americans with Disabilities Act ("ADA") and Oregon disability law. GP argues that there was no error in the district court, and that Indergard failed to exhaust administrative remedies under the ADA. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

**FACTUAL AND PROCEDURAL BACKGROUND**

Indergard worked at GP's Wauna mill facility from December 27, 1984, until February 8, 2006. On December 9, 2003, she took medical leave to undergo surgery for work-related and non-work related injuries to her knees. She remained on medical leave until March 21, 2005, when her orthopedic surgeon, Dr. Randall Ketzler, authorized her return to work, but with permanent restrictions. GP policy required employees to participate in a physical capacity evaluation (PCE) before returning to work from medical leave, and GP so informed Indergard.

GP contracted Columbia Rehabilitation ("Columbia"), an independent occupational therapy provider located in Washington state, to conduct the PCE. Cory Blickenstaff, a physical therapist at Columbia, visited the GP facility and conducted a job analysis for the Consumer Napkin Operator position, which was Indergard's position prior to her medical leave, and for the Napkin Adjuster position, which was the next position for which Indergard was entitled to bid under the collective bargaining agreement. Blickenstaff interviewed employees who worked in these positions, and identified the physical demands of the positions, including amount of weight an employee was required to lift, carry, push, pull, and hold, and the type of movements the positions required.

Among the lifting requirements that Blickenstaff identified were a sixty-five pound individual lift and carry for the Consumer Napkin Operator position and a seventy-five pound lift for the Napkin Adjuster position. In light of these requirements, Columbia determined that Indergard's permanent restrictions prevented her from participating in the PCE. Indergard met with GP supervisors and challenged the lifting requirements in the job analyses, alleging that they were inaccurate based on how the jobs were actually performed. Blickenstaff prepared a supplemental memorandum intended to clarify the requirements, but the job analyses were not revised.

On October 11, 2005, Indergard provided GP with a note from Dr. Ketzler that removed the permanent restrictions he had previously identified. GP then scheduled her to participate in the PCE. Vicky Starnes, a state-licensed occupational therapist at Columbia, conducted the PCE at Columbia's office on November 9 and 10, 2005.

On the first day of the PCE, Starnes recorded Indergard's medical history and subjective reports of her current pain level and use of medication, alcohol, tobacco, and assistive devices. Starnes recorded Indergard's weight, height, blood pressure, and resting pulse. She observed Indergard's gait, balance, and posture. She measured the range of motion in Indergard's arms and legs, and compared the results to normal limits. Starnes palpated Indergard's knees and looked for edema in her legs, and performed manual muscle testing, recording the results of Indergard's hip flexors, knee extensors and flexors, bilateral internal and external hip rotation, and straight leg raises.

Next, Starnes measured Indergard's ability to lift various amounts of weight from floor to waist, waist to chest, and chest to overhead, and evaluated Indergard's body mechanics during the lifts. She then measured Indergard's ability to carry increasing amounts of weight over a set distance, and her grip

strength over varying grip widths. She measured Indergard's static strength to determine her ability to lift, push, and pull in various postures, and compared Indergard's results to norms adopted by the U.S. Department of Health and Human Services. Indergard then performed a "Job Simulation Task," which required her to lift and pour five gallon buckets filled with forty-five pounds of sand. Starnes then tested Indergard's ability to place nuts and bolts in a box while kneeling with her vision obscured, and observed Indergard's ability to climb stairs, stand, sit, kneel, squat, and crawl. Indergard walked on a treadmill for twenty minutes at a 2.8 mile per hour pace, and pushed a weight sled. Finally, Starnes recorded details about Indergard's vision, communication, cognitive ability, hearing, attitude, and behavior.

The second day of the PCE included similar tests. Starnes measured and recorded Indergard's heart rate after she performed the treadmill test, and noted that she required "increased oxygen" and demonstrated "poor aerobic fitness." Starnes concluded that Indergard was unable to perform the sixty-five pound lift and carry that Blickenstaff had identified as a requirement of the Napkin Operator position, or the seventy-five pound lift that Blickenstaff identified as a requirement for the Napkin Adjuster position. Starnes recommended that Indergard not return to work, and forwarded the results of the PCE to Dr. Ketzler, who agreed with Starnes's assessment. The lifting requirements that the PCE indicated Indergard could not meet were those that she had previously contested as inaccurate.

GP then informed Indergard that she could not return to either position, and that no other positions were available for which she was qualified. On February 8, 2006, GP terminated her employment pursuant to a provision in the collective bargaining agreement that allowed GP to terminate employees who had been on leave for more than two years. Indergard filed a union grievance, which was denied, and filed a joint complaint with the EEOC and BOLI. The administrative

investigation found no substantial evidence to support her claims. She received right to sue letters, and filed this action.

Indergard alleged various claims of disability discrimination under the ADA and Oregon disability law. Relevant to this appeal, she alleged that GP misrepresented the essential job functions of the position in which she had worked prior to going on medical leave, forced her to participate in the PCE without "an objectively reasonable basis for doing so," and refused to allow her to return to employment after the PCE. In her first claim for relief, Indergard alleged that the PCE was improper and discriminatory, and that GP relied on the PCE to "remove and/or deny" her return to employment. She also raised other claims under the ADA, including that GP treated her "in a disparate, discriminating and harassing manner" because she was disabled, had a record of disability or was perceived as disabled, and that GP failed to engage in the interactive process. She sought relief in the form of loss of income, and $250,000 in non-economic damages.

GP moved for summary judgment, and Indergard's response abandoned all claims except those alleging that the PCE was an improper medical examination and that GP discriminated against her because of a perceived disability or record of disability. GP's reply argued that the PCE was not a medical examination, and that it therefore did not violate the ADA. It further argued that even if the PCE was a medical examination, it was job-related and consistent with business necessity, and therefore expressly allowed by the ADA. *See* 42 U.S.C. § 12112(d)(4)(A).[1]

---

[1](A) Prohibited examinations and inquiries

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A).

The magistrate judge agreed with GP that the PCE was not a medical examination. Because the magistrate judge determined that the PCE was not a medical examination, he concluded that GP had not violated 42 U.S.C. § 12112(d)(4)(A) and that it was entitled to summary judgment. In the interest of providing a thorough analysis, however, the magistrate judge analyzed GP's business necessity defense. Noting that the standard to establish business necessity is "quite high," the magistrate judge found that although GP had a reasonable basis to request the PCE, it "would not be entitled to summary judgment on the basis of the business necessity defense because [GP] failed to show that the PCE was limited to the essential functions" of Indergard's prior positions. The magistrate judge, however, decided that GP was nonetheless entitled to summary judgment because the PCE was not a medical examination.

Indergard filed objections, but the district court adopted the Findings and Recommendation in full and granted GP's motion for summary judgment. This appeal followed.[2]

## DISCUSSION

### I.   The district court erred in holding that the PCE was not a medical examination under the ADA

[1] Under the ADA, an employer may not require a current employee to undergo a medical examination unless the examination "is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). This section applies to all employees, whether or not they are disabled under the ADA. *Fredenburg v. Contra Costa County Dep't of Health Servs.*, 172 F.3d 1176, 1182-82 (9th Cir. 1999). The implementing regulations impose the same restriction, but state that an employer "may make inquiries into the ability of

---

[2]Indergard does not appeal the district court's grant of summary judgment on her discrimination based on perceived disability claim.

an employee to perform job-related functions." 29 C.F.R. § 1630.14(c). Thus, we must determine whether the PCE was a medical examination under the ADA or simply an inquiry into whether Indergard was capable of performing the job-related functions of the positions she was qualified to return to after her medical leave.

### A.   Regulatory guidance indicates that the PCE was a medical examination

Neither the ADA nor the implementing regulations define the term "medical examination," and case law interpreting this provision is limited. Agency guidance on the issue, however, is more detailed. Although agency guidance documents are "not controlling upon courts by reason of their authority, [they] do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986) (internal quotation marks and citation omitted); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (stating that "interpretations contained in policy statements, agency manuals, and enforcement guidelines . . . are 'entitled to respect' . . . only to the extent that [they] have the power to persuade") (internal quotation marks and citation omitted).

**[2]** The interpretive appendix to 29 C.F.R. § 1630.14(c) states, in relevant part, that "[t]his provision permits employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." 29 C.F.R. Pt. 1630, App. § 1630.14(c). The interpretive appendix to 29 C.F.R. § 1630.14(a) also contemplates the use of "[p]hysical agility tests," which "are not medical examinations and so may be given at any point in the application or employment process." *Id.* at App. § 1630.14(a). The appendix further states that physical agility tests "must be given to all similarly situated applicants or employees regardless of disability," and notes that if the test "screen[s] out or

tend[s] to screen out an individual with a disability . . . the employer would have to demonstrate that the test is job-related and consistent with business necessity and that performance cannot be achieved with reasonable accommodation." *Id.*

**[3]** EEOC Enforcement Guidance draws a further distinction between medical examinations and physical agility tests. It defines a medical examination as "a procedure or test that seeks information about an individual's physical or mental impairments or health." *Enforcement Guidance on Disability-Related Inquiries and Medical Examinations*, *available at* http://www.eeoc.gov/policy/docs/guidance-inquiries.html [hereinafter "*EEOC Enforcement Guidance*"]. It provides the following seven factors to be considered in determining whether a test is a medical examination:

> (1) whether the test is administered by a health care professional
>
> (2) whether the test is interpreted by a health care professional
>
> (3) whether the test is designed to reveal an impairment of physical or mental health
>
> (4) whether the test is invasive
>
> (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task
>
> (6) whether the test normally is given in a medical setting
>
> (7) whether medical equipment is used

*Id.* The *EEOC Enforcement Guidance* states that although in some cases a combination of factors may be relevant to the

determination of whether a test is a medical examination, in "other cases, one factor may be enough to determine that a test or procedure is medical." *Id.* It then provides a list of tests considered medical examinations, including "blood pressure screening and cholesterol testing" and "range-of-motion tests that measure muscle strength and motor function." *Id.*

**[4]** The *EEOC Enforcement Guidance* states that certain employer-required tests are generally not medical examinations, including

> physical agility tests, which measure an employee's ability to perform actual or simulated job tasks, and physical fitness tests, which measure an employee's performance of physical tasks, such as running or lifting, *as long as these tests do not include examinations that could be considered medical (e.g., measuring heart rate or blood pressure).*

*Id.* (emphasis added).

### 1.    Single factors establish that the PCE was a medical examination

**[5]** In light of the agency guidance, Indergard's argument that the PCE was a medical examination is convincing. As noted above, the PCE included range of motion and muscle strength tests, and Starnes measured Indergard's heart rate and recorded an observation about her breathing after the treadmill test. Each of these tests is within the EEOC's description of tests that are considered medical examinations. The post-treadmill test heart rate measurement and notation regarding Indergard's "increased oxygen" intake and demonstration of "poor aerobic fitness" weigh heavily in favor of considering the PCE a medical exam, particularly because Starnes had already noted that Indergard "was able to walk for 20 minutes at 2.8 mph on treadmill without increased antalgic behavior or objective findings of pain complaints noted." Had

Starnes's observations ended there, it might be appropriate to characterize the treadmill test as a test that measured Indergard's performance of a physical task. Measuring Indergard's heart rate and recording observations about her breathing and aerobic fitness, however, was not only unnecessary to determine whether she could perform the task, but is also the kind of examination that the *EEOC Enforcement Guidance* identifies as inappropriate to include in a non-medical physical agility or fitness test.

GP's argument that anything less than a "genuine exercise stress test" is not a medical examination distorts the *EEOC Enforcement Guidance* and is not well-taken. Furthermore, to the extent that GP attempts to rely on the magistrate judge's conclusion that Indergard's blood pressure and heart rate were measured as an "overall precaution before beginning testing rather than to measure [Indergard's] physiological response to the performance portion of the PCE," we emphasize that her heart rate was taken both before and after the treadmill test, and we note that although it might be a prudent medical procedure to take these physiological measurements, including them in the report provided to GP was unnecessary for the purpose of determining whether Indergard was physically capable of performing her job duties.

### 2. Application of the seven-factor test establishes that the PCE was a medical examination

[6] The *EEOC Enforcement Guidance* identifies seven factors as relevant to determining whether a test is a medical examination, and at least four weigh in Indergard's favor. First, although Starnes is not a medical doctor, she is a licensed occupational therapist. Nothing in the *EEOC Enforcement Guidance* indicates that the term "health care professional" should be limited to only doctors, and at least one district court has found that the fact that a PCE "was administered by a business specializing in physical therapy, and not a medical doctor, makes it no less 'medical' than a

nurse taking one's blood pressure or an emergency medical technician administering care to a patient on the way to the hospital." *Medlin v. Rome Strip Steel Co.*, 294 F. Supp. 2d 279, 294 (N.D.N.Y. 2003).

**[7]** Second, not only did Starnes administer the PCE, but she interpreted Indergard's performance and recommended that she not return to work. Furthermore, Starnes submitted the test results to Dr. Ketzler, Indergard's treating orthopedic surgeon, who indicated his agreement with Starnes's recommendation. This distinguishes the PCE from a test where, for example, a supervisor or other employee might observe the employee's physical ability to perform job tasks.

**[8]** Third, although the PCE was ostensibly intended to determine whether Indergard could return to work, the broad reach of the test was capable of revealing impairments of her physical and mental health, particularly in light of Starnes recording Indergard's subjective reports of her current pain level, use of medication and assistive devices, and communication, cognitive ability, attitude, and behavior.

**[9]** The fourth factor weighs in GP's favor, as the PCE does not seem to have been invasive. The fifth factor, however, benefits Indergard because Starnes recorded her heart rate and breathing pattern after the treadmill test, and Indergard's muscle pain and stiffness after the first day of testing. These are measurements of Indergard's physiological response to her performance of a task and, as discussed above, go beyond collecting information necessary to determine whether Indergard was physically capable of performing the task. We express no opinion on the sixth factor, except to note that the offices of a licensed occupational therapist are more like a medical setting than, for example, an employee's work place.

**[10]** Finally, it is unclear whether the final factor favors either party, because the only evidence that medical equipment was used in the PCE is Starnes's use of a blood pressure

cuff at the beginning of the PCE. Thus, viewed in the light most favorable to Indergard, applying the balancing factors establishes that the PCE was a medical examination.

**B.   The limited case law available establishes that the PCE was a medical examination**

**[11]** Most cases interpreting 42 U.S.C. § 12112(d)(4)(A) address the question of whether an admitted medical examination was job related and consistent with business necessity. *See, e.g.*, *Yin v. California*, 95 F.3d 864, 868 (9th Cir. 1996) (following the district court in assuming that the proposed examination was a medical examination within the meaning of 42 U.S.C. § 12112(d)(4)(A)).

The case most on point is *Medlin*, 294 F. Supp. 2d at 293-94. Medlin, an employee, had been on medical leave after a back injury. *Id.* at 284. Prior to returning to work, his employer required him to undergo a functional capacity evaluation ("FCE") to determine whether his residual functional capacity met the job requirements for the position he previously held. *Id.* at 285. The FCE results revealed that Medlin was "unable to maintain safe work practices or a heart rate profile required for the level of repetitions and duration for a complete Hot Role Slitter setup." *Id.* (internal quotation marks omitted). Medlin sued, alleging in part that the employer made an improper disclosure of his medical information in violation of the ADA when it made the results of the FCE known to other employees. *Id.* at 293.

The court stated that the FCE was clearly job related and consistent with business necessity, but noted that it was unclear whether it qualified as a medical examination. *Id.* Without reaching a definitive conclusion, the court noted that EEOC guidance and case law had indicated "that testing ordered by the employer that physically or mentally tests an employee's ability to perform his or her job are permissible tests under the ADA." *Id.* at 293-94 (citing 29 C.F.R. Pt.

1630, § 1630.13(b); *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999)). The court then found that because the sole purpose of the FCE was to determine whether Medlin "could physically return to work without any restrictions" and was "in essence and in reality, a fitness for duty exam," it therefore was likely a medical examination. *Id.* at 294.

GP argues that because the FCE in *Medlin* was administered to determine whether the employee could perform the physical demands of his position without any restrictions, it was designed to test the level of his disability and is therefore distinguishable from the PCE in this case. This distinction is unpersuasive. Although the court did state that the purpose of the FCE was to determine whether Medlin "could physically return to work without any restrictions," *id.*, it was administered to an injured employee returning from medical leave in order to ascertain whether he was capable of performing the physical demands of his position. *Id.* at 284-86. Thus, there is little to distinguish the FCE at issue in *Medlin* from the PCE at issue here.

Furthermore, the Second Circuit has held that an employer's policy that all employees returning from sick leave provide a medical certification that included a "brief general diagnosis that is 'sufficiently informative as to allow [the Department of Correctional Services] to make a determination concerning the employee's entitlement to leave' " was "sufficient to trigger the protections of the ADA under [42 U.S.C. § 12112(d)(4)(A)]" because the general diagnosis "may tend to reveal a disability." *Conroy v. New York Dep't of Corr. Serv.*, 333 F.3d 88, 92, 95-96 (2d Cir. 2003). Although *Conroy* was interpreting the provision in 42 U.S.C. § 12112(d)(4)(A) that prohibits an employer from making "inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability" and is not directly on point, its reasoning is useful to the extent that portions of Indergard's PCE went

beyond simply measuring her physical ability to perform job tasks and could have revealed a disability.

[12] The purpose of the PCE may very well have been to determine whether Indergard was capable of returning to work. The substance of the PCE, however, clearly sought "information about [Indergard's] physical or mental impairments or health," *see EEOC Enforcement Guidance*, and involved tests and inquiries capable of revealing to GP whether she suffered from a disability. Therefore, we hold that the PCE was a medical examination under 42 U.S.C. § 12112(d)(4)(A).[3]

---

[3]The dissent predicts a parade of lawsuit horribles for employers if Indergard's PCE is held to be a medical examination within the meaning of 42 U.S.C. § 12112(d)(4)(A). To reach this conclusion, the dissent disregards statutory language and commentary by dividing the comprehensive PCE into its component tests for analysis. In addition, the dissent would require Indergard to show that a particular component test was a medical examination that proximately caused her to lose her job, a rationale that has not been adopted in this circuit.

"The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The statute provides that an employer "shall not require a medical examination . . . unless such examination . . . is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The *EEOC Enforcement Guidance* for § 12112(d)(4)(A) clarifies that testing blood pressure, cholesterol, muscle strength, and motor function specifically are designated as medical examinations. "The whole purpose of placing a person on leave is that he or she may eventually return to work." *Fredenburg*, 172 F.3d at 1181.

"The ADA was enacted in 1992 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.' " *Yin*, 95 F.3d at 867 (quoting 42 U.S.C. § 12101(b)). The ADA provisions that prohibit using medical examinations to discriminate in hiring or retaining employees protect all employees from being stigmatized by their disabilities. 42 U.S.C. § 12112(d); *see Fredenburg*, 172 F.3d at 1182 ("protecting only qualified individuals would defeat much of the usefulness of [the medical examination provisions]"). The dissent's method of dividing Indergard's PCE into component parts and engaging in proximate-cause analysis creates a risk that employers would

## II.   Exhaustion of administrative remedies

GP argues that Indergard failed to exhaust administrative remedies because her joint EEOC/BOLI complaint did not provide requisite notice of the unlawful medical examination claim. Indergard argues that the court should not reach this issue because she has alleged identical claims under Oregon's state disability law, which is substantively the same as federal

---

seek to obtain medical information in tests that are not job-related and thereby escape liability by asserting that their employment decisions were based on information revealed in non-medical components of the evaluation. This would promote unnecessary litigation, contravene the statutory prophylactic purpose, and deter disabled employees from returning to work following medical leave, because of concern for being stigmatized by their disabilities.

Indergard was given a treadmill/blood-pressure test, which is used to detect arterial blockages that could result in open-heart surgery. Unquestionably, this is a medical examination, and taking blood pressure following treadmill exertion is a critical part of the test not to be separated from it. Yet, the dissent segregates the blood-pressure test from this standard medical procedure and re-characterizes it as incidental or a technical violation of § 12112(d)(4)(A). While testing blood pressure is explicitly designated in the statutory commentary as being a medical examination, the therapist, who administered the PCE, took many physiological measurements during the two-day testing, given as a composite examination. Avoiding the statutory language, commentary, and purpose, the dissent endeavors to convert the two-day PCE into a physical agility test, which employers can give at any time, by dividing it into its component tests and analyzing them separately.

Using this cut-and-divide approach, for which the dissent gives no authority, not only dispenses with Indergard's blood-pressure test as incidental but also focuses on her weight-lifting testing as the basis or proximate cause for her termination. The therapist, who administered the PCE, determined that Indergard could not accomplish the 65-pound lift and carry nor the 75-pound lift, respectively required for her former Consumer Napkin Operator position or the Napkin Adjuster position, for which she would have been entitled to bid under the applicable collective bargaining agreement. Indergard's doctor had deemed her able to return to work and subsequently agreed with her termination, based solely on the weight lifting purportedly required for the two jobs.

law but does not require administrative exhaustion, that GP waived the failure to exhaust argument by way of a judicial admission in its answer, that GP did not allege failure to exhaust as an affirmative defense, and that because the EEOC would have addressed the medical examination in the scope of its investigation, the claim was properly before the district court.

Because the magistrate judge determined that the PCE was not a medical examination, he declined to reach GP's argument that Indergard failed to exhaust her administrative remedies with respect to this claim. In remanding this case, we do not express any view on this argument, and the issue remains open for the district court's consideration.

## CONCLUSION

[13] We hold that the PCE was a medical examination within the meaning of 42 U.S.C. § 12112(d)(4)(A). Because the magistrate judge correctly found that a triable issue of fact remained on the question of whether the PCE was job related and consistent with business necessity, the summary judgment

---

This circuit has not adopted a proximate-causation requirement in the context of § 12112(d)(4)(A). The dissent's reliance on *Armstrong v. Turner Industries, Inc.*, 141 F.3d 554, 562 (5th Cir. 1998), is inapposite because *Turner* concerned a pre-employment examination and not an employee's returning to work from medical leave. An employee, who has worked for a company, has more invested in that employment, including benefits, than an applicant for employment. Therefore, the employee has more to lose by job termination than an applicant, and the employee also effectively has been penalized for a medical absence, when his or her job is lost upon return to work. Using its component-test analysis, the dissent insists that Indergard has no cause of action, but she did lose her job when she returned from medical leave because of the subject PCE. The dissent cannot inject into the plain statutory language a contrived proximate-cause requirement. As GP notes, proximate cause "is not an issue the Court needs to decide in this appeal" before initial determination by the district court and briefing on appeal. Appellee's Br. at 22 n.5. Treating the two-day PCE as a whole, rather than analyzing its discrete tests, promotes the deterrent purpose behind § 12112(d)(4)(A).

was inappropriate. We vacate the judgment and remand the case to the district court to determine whether the PCE was job related and consistent with business necessity, and to determine whether Indergard exhausted administrative remedies.

**VACATED and REMANDED.**

O'SCANNLAIN, Circuit Judge, dissenting:

The essential distinction between a medical examination and a physical fitness or agility test, for the purposes of the

Moreover, Indergard continues to argue on appeal that the 65-pound weight-lifting test for the Consumer Napkin Operator position, which was her job, and the 75-pound weight-lifting test for the Napkin Adjuster position are inaccurate weight requirements for these jobs. On summary judgment review, Indergard's statement of the weight requirements for the respective jobs must be accepted. *Cripe v. City of San Jose*, 261 F.3d 877, 895 (9th Cir. 2001). Because Indergard's inability to lift these weights resulted in her termination, the weight-requirement discrepancy for the two positions is a genuine issue of material fact, which precludes summary judgment. Fed. R. Civ. P. 56 (c); *Cripe*, 261 F.3d at 894-95. On remand, the district court can make this factual determination in deciding whether Indergard's medical examination was "job related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). GP has the burden of proving that the PCE weight lifting it required for the two positions satisfies the business necessity defense, which "is quite high, and is not to be confused with mere expediency." *Cripe*, 261 F.3d at 890 (citation, internal quotation marks, and alteration omitted); *see EEOC v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1091-92 & n.3 (6th Cir. 1998) (holding that family-owned grocery store did not violate § 12112(d)(4)(A) in terminating produce clerk for failing to have a medical examination to determine if he was HIV-positive, when the job involved use of "paring knives, chef knives, cleavers and pineapple corers, all of which are shared by the clerks," and the parties "agree[d] that produce clerks often cut themselves in the course of their regular duties"). The dissent's upholding summary judgment for GP in this case defeats the statutory purpose of § 12112(d)(4)(A) by creating a pretext by which employers could misuse medical examinations to discriminate against disabled employees returning to work from medical leave.

Americans with Disabilities Act ("ADA"), is that the former is designed to reveal disability, while the latter is designed to determine whether an employee can perform her job. I cannot conclude that the evaluation Kris Indergard underwent on her return to work at Georgia-Pacific was a medical examination under 42 U.S.C. § 12112(d)(4)(A), for it was not designed to reveal disability. Furthermore, even assuming that there were any "medical" aspects of the physical capacity evaluation ("PCE"), they were merely incidental to the physical agility aspects and did not in any way cause the harms that Indergard alleges. Therefore, I must respectfully dissent.

I

Indergard characterizes the PCE as "two days of testing, poking, palpating, and examining." However, over the course of those two days, no blood was drawn, no urine samples collected, no labwork performed, and no x-rays or scans taken. No doctor or nurse ever examined, diagnosed, or treated her. Instead, she went to an occupational therapy facility and performed various physical tasks designed to determine whether she could safely perform the duties of her old job. Such testing was unquestionably advisable given her own physician's permanent restrictions on climbing, kneeling, squatting, crawling, and lifting over thirty pounds. A common-sense reading of the term "medical examination" would not include this PCE.

Unfortunately, common sense plays no role in our ADA jurisprudence. Instead, the EEOC has muddied the jurisprudential waters by issuing "guidances" that appear to read the word "medical" right out of the statute. For example, the interpretive appendix to 29 C.F.R. § 1630.14(a) first states that "[p]hysical agility tests are not medical examinations" but then adds that "[i]f such tests screen out or tend to screen out individuals with disabilities, the employer would have to demonstrate that the test is job-related and consistent with business necessity . . . ." Apparently, having a tendency to

screen out disabled individuals automatically converts a physical agility test into a medical examination subject to the ADA. Given that physical agility tests by their very nature tend to screen out people with certain disabilities, I see no way for employers to conduct such tests without inviting ADA lawsuits from those who fail them.

In addition, an EEOC enforcement guidance defines a medical examination as "a procedure or test that seeks information about an individual's physical or mental impairments or health." *EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Evaluations*, *available at* http://eeoc.gov/policy/docs/guidance-inquiries.html [hereinafter *Enforcement Guidance*]. Under this broad definition, any return-to-work test would necessarily qualify as a medical examination because it seeks to determine whether the employee is fit enough to resume her duties. Employers seeking to avoid ADA lawsuits would have to allow injured workers to return to the job without being able to verify their fitness for duty, creating the potential for re-injury.

The *Enforcement Guidance* also declares physical agility tests not to be medical examinations "as long as these tests do not include examinations that could be considered medical (*e.g.*, measuring heart rate or blood pressure)." Hence, a single pulse measurement taken over the course of a two-day physical agility test would be sufficient to convert such test into a medical examination. If an employee taking a physical agility test shows obvious distress, the examiner would not be able to take her pulse or blood pressure as a precautionary measure without implicating the ADA. Employers seeking to ensure returning workers' safety must therefore navigate the precarious straits between the Scylla of ADA liability and the Charybdis of a negligence lawsuit. Fearing either form of liability, employers may very well decline to conduct any form of testing, thereby increasing the risk of returning worker injury.

The majority uncritically accepts these agency pronouncements as gospel, even though we owe them no deference when they subvert the plain text of the statute. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004). I decline to read the statute in such a way as to render a term entirely meaningless.

II

Turning to the PCE at issue in this case, I am not persuaded that it can be considered a medical examination merely by virtue of the "single factors" that the majority lists: range-of-motion and muscle strength tests, pulse measurement after a treadmill test, and observations about Indergard's breathing after the treadmill test. It is important to remember that the PCE was a two-day examination comprising numerous tests. While one or two of these measurements may arguably have been medical in nature, these were at most de minimis components that were incidental to the physical tasks that formed the bulk of the PCE.

Furthermore, application of the seven-factor test also does not convince me that the PCE as a whole was a medical examination. In particular, I disagree with the majority's conclusions regarding factors three, five, and seven. Factor three asks "whether the test is designed to reveal an impairment in physical or mental health." *Enforcement Guidance*. According to the majority, "although the PCE was ostensibly intended to determine whether Indergard could return to work, the broad reach of the test was capable of revealing impairments of her physical and mental health." Maj. op. at 13896. Here the majority appears to confuse intent with effect. Because the majority believes that the PCE *could* reveal an impairment, it assumes that Georgia-Pacific *intended* for it to do so. I do not read factor three so broadly. With respect to factors five and seven, any measurement of physiological response and use of medical equipment were de minimis in the overall context of

the two-day PCE. On balance, the PCE looks overwhelmingly more like a physical agility test than a medical examination.

### III

In my view, the PCE cannot be considered a single examination but rather a battery of individual tests. By its viewing of the PCE, the majority allows Indergard to proceed with her suit even though she has shown *no injury* resulting from the allegedly medical tests. However, it was unquestionably the lifting task that scuttled Indergard's return to work, not her pulse rate after the treadmill test or her knee flexion. Because she has suffered no injury from the parts of the test that allegedly were medical examinations, she cannot maintain a claim for a violation of § 12112(d).

Our sister circuits have agreed that a plaintiff seeking relief under 42 U.S.C. § 12112(d) must be able to show "something more than a mere violation of that provision. There must be some cognizable injury in fact of which the violation is a legal and proximate cause for damages to arise from a single violation." *Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 562 (5th Cir. 1998); *see also Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 519 (3d Cir. 2001); *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999); *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 594-95 (10th Cir. 1998). In other words, "a technical violation" is not enough. *Tice*, 247 F.3d at 520. Here, even assuming that Georgia-Pacific technically violated § 12112(d)(4)(A) by measuring Indergard's pulse and range of motion, she has made no showing that such measurements have proximately caused her to lose her job. Therefore, any such measurements "presents no 'injury' capable of remedy, and thus affords no basis for suit." *Id.* at 519.

*Armstrong* is instructive because it presents a scenario analogous to this case, albeit in the context of preemployment medical inquiries.[1] Armstrong had applied for a position as a

---

[1]Preemployment medical inquiries and examinations fall under 42 U.S.C. § 12112(d)(2) of the ADA. Although the majority attempts to dis-

pipefitter and was asked questions in his application about prior injuries, his medical history, and worker's compensation claims. The questionnaire also asked whether he had "any injury or condition not mentioned on this form," and Armstrong answered "no." A background check later revealed that Armstrong had previously reported "possible asbestos exposure," and he was "rejected due to the provision of incorrect and/or incomplete information." 141 F.3d at 556-57. Because the failure to hire had not resulted directly from the prohibited medical inquiries, the court held that Armstrong lacked standing to sue for damages and injunctive relief under § 12112(d)(2)(A). *Id.* at 562-63. The court noted that the ADA was not intended to protect employees from adverse employment actions "incident to a prohibited section 12112(d)(2)(A) inquiry." *Id.* at 560 n.15.

Similarly, Indergard's termination was merely incident to an alleged technical violation of § 12112(d)(4)(A). Had Georgia-Pacific administered only the treadmill exercise and range-of-motion tests, she would not have a cause of action under the ADA even assuming that they are medical examinations because she suffered no adverse employment action from these tests. Conversely, had Georgia-Pacific administered the lifting task alone, she also would not have a cause of action because the lifting task is not a medical examination. Only by yoking these tests together and attributing an injury from a permissible physical agility task to an allegedly improper medical examination can Indergard manufacture an ADA violation.

---

tinguish *Armstrong* on this basis, *see* Maj. op. at 13901 n.3, the same analysis applies to all of the medical inquiry and examination provisions under 42 U.S.C. § 12112(d). *See Tice*, 247 F.3d at 519 ("Other courts of appeal have addressed the question whether a plaintiff has a cause of action for a violation of § 12112(d) without demonstrating the existence of an injury-in-fact . . . . All have concluded that a violation of § 12112(d), without a showing, presents no 'injury' capable of remedy, and thus affords no basis for suit.").

IV

Because the majority renders the term "medical" meaningless and allows a plaintiff to continue her $250,000 suit on the basis of a pulse measurement that caused her no harm, I respectfully dissent.